# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Tamares Las Vegas Properties, LLC, et al.,

    Plaintiffs

v.

The Travelers Indemnity Company,

    Defendant

Case No.: 2:16-cv-02933-JAD-NJK

**Order Granting in Part in Denying in Part Defendant's Motion for Summary Judgment, Denying Plaintiffs' Motion for Summary Judgment, Denying Defendant's Motion to Strike, and Granting Plaintiffs' Motion for a Surreply**

[ECF Nos. 101–102, 113, 116]

In early 2016, the Plaza Hotel & Casino in Downtown Las Vegas hired a contractor to renovate its roof by, among other things, replacing the rooftop pool. The contractor quickly removed the entire existing pool and the layers of concrete and waterproof membrane that had topped its surrounding deck, leaving a large hole in the roof and a perimeter of exposed corrugated metal that had supported the protective layers. But before the contractor could replace the pool or its exposed deck, weather forecasts in early April began predicting rainfall several days out—risking water entering through the roof's exposures. The contractor therefore spent several days implementing weatherproofing measures, including covering the pool opening with at least one large tarp that was tied and weighted down to the rooftop. But the storm was stronger than expected, and the resulting rain, wind, and hail tore open the tarp and allowed water to penetrate and damage the building.

Plaza immediately made a claim to its insurer Travelers Indemnity Company, which eventually denied coverage, citing an exclusion and a limitation to Plaza's policy. So, Plaza and two related corporations (collectively Plaza) sue Travelers for breach of the contract and its implied covenant of good faith and fair dealing. Both sides move for summary judgment.

Although Travelers contends, as a threshold matter, that its contractual duty to provide coverage never arose because Plaza allegedly failed to preserve the original tarp that covered the pool opening, the relevant policy provision is not sufficiently clear to constitute a condition precedent to coverage. I therefore proceed to the merits and deny both parties summary judgment as to Plaza's first breach-of-contract claim for property damage. There is no merit to Plaza's argument that, because the policy covers temporary structures, any damage related to the tarp was covered; that provision defines in part what property is insured under the policy, but the policy only pays out benefits if "Covered Property" is damaged by a "Covered Cause of Loss." So, the only issue relevant to this claim is whether the rain was a covered cause of loss or whether the damage falls under the policy's rain limitation—a question that ultimately hinges on whether the tarp and other weatherproofing measures that covered the Plaza's exposures constitute a "roof." Because I find that, based on the record before me, a reasonable jury could decide that question either way, this claim must proceed to trial.

But I grant Travelers summary judgment on Plaza's second breach-of-contract claim on the loss of business income. The policy only covers business income that is lost if Plaza suspends operations to make repairs necessitated by a covered loss. The undisputed evidence shows that Plaza has not begun repairs and has thus not yet incurred an actual loss of business income. Finally, I also grant Travelers summary judgment on Plaza's claim for breach of the implied covenant of good faith and fair dealing. I previously gave Plaza leave to amend its complaint to plead only the version of this claim sounding in contract (rather than in tort), and Plaza has not advanced evidence showing that, despite complying with the terms of the policy, Travelers violated the spirit of their agreement.

## Background

The Plaza consists of two high-rise hotel towers that flank a four-story building housing the casino, shops, restaurants, and convention space.[1] Hotel guests can access the top of this central building, which features a rooftop pool and tennis courts. The roof's deck consists of a layer of lightweight concrete known as a "topping slab" that sits atop a layer of waterproof membrane and a layer of "structural concrete," which was originally poured directly onto the sheets of corrugated metal fastened to the steel beams that support the roof. In February 2016, Plaza hired Breslin Builders as a general contractor to renovate the roof and its amenities by removing and replacing the pool; replacing the pool's support structure of steel beams and cross bracing; replacing the corroded corrugated-metal around the pool's perimeter; and replacing the topping slab and waterproof membrane for the entire rooftop.[2]

During that initial month, Breslin completely removed the pool, leaving a 30x50 foot hole in the roof that exposed its supporting steel beams.[3] A room housing pool-related machinery and equipment sat directly below this exposure in the central building's fourth floor. Because Breslin sought to repair or replace the corrugated-metal sheets that had directly surrounded the pool before replacing it, Breslin first had to remove the layers of concrete and waterproof membrane that topped these sheets for several feet around the hole's edge.[4] So, by

---

[1] ECF No. 101 at 6 (Travelers's statement of undisputed facts).

[2] *Id*. at 6–7.

[3] *Id*. at 7; ECF No. 103-1 (Errata to ECF No. 101) at 11–22 (photos of the work in progress).

[4] ECF No. 101 at 7; ECF No. 103-1 at 13–22 (showing several feet of exposed corrugated metal abutting each edge of the former pool, followed by many more feet of a decking that has at least some layers removed).

the time of the storm at issue in April, the entire rooftop area that was exposed to the elements measured 47x75 feet.[5]

## I.  Weather predictions prompt storm-preparation efforts.

As early as Saturday, April 2, the National Weather Service (NWS) began predicting rain for the end of the week, with a 40% chance of rain for that coming Friday.[6]  By Monday, when Breslin became aware of the forecasts,[7] the projected chance of rain increased to 50% for that Friday and Saturday.[8]  Over the next two days, a "slight chance of thunderstorms" was forecasted for Friday and eventually Saturday (the day of the storm), and the likelihood of rain for those two days gradually increased to 70%.[9]

---

[5] ECF No. 101 at 7.  Although Travelers at times refers to a 47x57 foot hole in the roof, these dimensions refer to the 30x50 foot hole created by the pool's removal and the additional feet of exposed corrugated-metal and partially removed decking that abutted the hole.

[6] ECF No 101-10 at 7 (NWS report attached to declaration of William Badini, Travelers's proposed meteorological expert).  Plaza points out that Badini testified in deposition that NWS data, though available to the general public, is typically used by meteorologists, who then issue weather reports for general consumption. ECF No. 110 at 7 n.2.  But Plaza's proposed meteorological expert, Dr. Elizabeth Austin, also relies on NWS data in her report and rebuttal to Badini's report.  *See generally* ECF No. 102-2.  And Plaza hasn't pointed to evidence showing that its employees or Breslin's employees didn't rely on NWS reports in anticipating the oncoming storm or that other reports contradicted the NWS data that each side cites.

[7] ECF No. 101 at 8; ECF No. 102 at 5 (Plaza's summary-judgment motion); ECF No. 101-4 at 7 (Pasco Depo.).

[8] ECF No 101-10 at 11.  Plaza doesn't discuss the weather forecast in much detail and merely includes a parenthetical summary of Dr. Austin's report, which cites a 10% chance of rain.  ECF No. 102 at 5 (citing ECF No. 102-2 at 19).  This snapshot of her report, however, appears to cite a forecast for Saturday, April 9 (the day of the storm) that was issued that morning.  ECF No. 102-2 at 19 (issued 16:24 UTC).  This forecast therefore doesn't reflect what weather Breslin anticipated for Saturday *during the preceding week*, while it attempted to waterproof the Plaza's exposed rooftop.  And Austin's rebuttal to Travelers's expert report acknowledges that "the NWS public zone forecast" on the morning of Saturday, April 9, "for the region that included the Plaza" showed a 70% chance of rain.  I therefore don't perceive a dispute as to the forecasted likelihood of rain.

[9] ECF No 101-10 at 13–19.

Once Breslin learned of the inbound storm, it began implementing measures to keep the rainfall from entering the Plaza through the exposures in its roof. Breslin's primary means of protecting the 30x50 foot hole from the removed pool was to seal the opening with at least one large tarp,[10] which Breslin attempted to secure to the roof by tying it down with rope, weighting down the edges with jersey barriers and other heavy objects, and welding the edges to the ground with a blowtorch.[11] The tarp did not extend over the surrounding perimeter of exposed metal and decking.[12] Rather, Breslin covered these portions of the roof with Visqueen, a form of plastic sheeting, that was also torched down and weighted down with sandbags and other heavy objects.[13] And for some specific openings on the deck, Breslin attached the Visqueen to heated tar-like material to create a waterproof seal.[14]

## II.    The storm's impact exceeded expectations.

At some point on Saturday, April 9, the anticipated storm passed over the Plaza. It is unclear in the record precisely how much rainfall and wind Breslin expected during its preparations.[15] The parties' proposed metrological experts also dispute how much rain on

---

[10] As discussed below, Plaza asserts that is unclear which tarp of the several that Breslin purchased were used to patch the roof and whether, at any point, more than one layer of tarp was used. But it is undisputed that at least one tarp was in place before the storm started.

[11] *E.g.*, ECF No. 110-39 at 3–4 (Cherry Decl.).

[12] ECF No. 110 at 5.

[13] ECF No. 110-39 at 3–4; ECF No. 101-4 at 6, 9 (Pasco Depo.).

[14] ECF No. 102-9 at 20–21 (Reed Depo.); ECF No. 102-12 at 30, 33–34 (Owens Depo.).

[15] *See, e.g.*, ECF No. 102-2 at 24 (Plaza's proposed meteorological expert opining that "light showers and only weak, isolated thunderstorms were expected" but not stating specific values or ranges); ECF No. 101-11 at 4–7 (Daniel Weatherbie, a Breslin project manager who hadn't worked on the Plaza renovation until storm preparations were underway, testifying that he believed he was called in because Breslin anticipated a "large storm" would hit).

average falls in Las Vegas in April,[16] the frequency with which storms exceed that figure,[17] and the precise amount of actual rainfall at the Plaza on April 9.[18]  But it is undisputed that the storm that day was more severe than Breslin or the NWS predicted.  More than an inch of rain fell during a short window of time, hail measuring approximately 0.65 inches struck the rooftop, and windspeeds topped 32 miles per hour.[19]  As a result, the tarp protecting the hole left by the rooftop pool tore open,[20] allowing rain to enter the building and causing damage to its interior.

### III.  Travelers denied coverage for the storm damage.

Plaza was insured under a Travelers policy at the time of the storm,[21] and it immediately notified Travelers of its damage and possible claim.  Two days after the storm, Richard Kim, a Travelers adjuster, arrived at the Plaza to assess the damage and loss.  He inspected tarps that at some point had covered the pool hole during the storm and noted that they were damaged.[22]  As discussed below, there is a dispute—one that I ultimately determine is immaterial—as to whether

---

[16] *See, e.g.*, ECF No. 102-18 (Travelers's proposed meteorological expert discussing an average of 0.33 inches of rain for February through April); ECF No. 102-2 at 2 (Plaza's proposed expert citing an average of 0.15 inches of rain in April);  ECF No. 102-2 at 27 (Plaza's proposed expert, in a rebuttal report, disagreeing with the methodology employed by Travelers's proposed expert to assess average rainfall in April).

[17] *Compare* ECF No. 102-2 at 2 (Plaza's expert concluding that the "recurrence rate" for the rainfall experienced was "one-in-one-hundred years"), *with* ECF No. 102-18 at 14 (Travelers's proposed expert discussing in his conclusion that the "return frequency" for the rainfall was one-in-five years).

[18] *Compare* ECF No. 102-2 at 2 (Plaza's expert concluding that about 1.5 inches of rain fell in an hour or less), *with* ECF No. 102-18 at 82 (Travelers's expert concluding that 1.1 inches of rain fell on the Plaza from Saturday to Sunday morning, with 0.63 inches falling in 25 minutes).

[19] *See supra* note 18; ECF No. 102-2 at 2, 9.

[20] ECF No. 101-4 at 10 (Pasco Depo.: "The rain completely shred[ded] this tarp"); ECF No. 110-8 at 84 (Weatherbie describing the tarps after the storm as "[s]hredded" and "mostly torn and in pieces").

[21] ECF No. 103-1 at 28.

[22] ECF No. 102-27 at 19 (Kim's electronic notes).

Kim was shown all the tarps that had been used to weatherproof the roof. Nonetheless, Kim determined that, because Plaza had used the tarps to seal the hole in the roof and the storm ripped open that seal, allowing rain to enter, the "rain limitation" to Plaza's policy didn't apply and the loss was therefore covered.[23] Kim also made an initial physical-loss assessment of about $500,000.[24]

But Travelers continued to investigate the damage, and in late May 2016, sent Plaza a letter denying the claim.[25] The letter explained Travelers's conclusions that Breslin had failed to properly weatherproof the roof in preparation for the storm and, even prior to the storm, had acted unreasonably by removing more layers of decking than could be replaced in a single day.[26] Based on this assessment, Travelers cited two reasons the policy did not cover Plaza's loss: the faulty-workmanship exclusion and the rain limitation.[27] Plaza eventually filed suit against Travelers, seeking contract damages for the amount of physical loss to its property and resulting lost income—a figure that Plaza believes exceeds $43 million.[28]

### Legal standard

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[29] The moving party bears the initial responsibility of

---

[23] *Id*. at 18 ("[T]here is an open shell requirement for interior water damage. The tarp over the pool served as a shell for the building as repairs were underway. Wind damage occurred to the tarp system causing the damage inside. Because there was an open shell, there is no limitation for the interior water damage for this loss.").

[24] *Id*. at 19.

[25] ECF No. 102-38.

[26] *Id*. at 3.

[27] *Id*. at 4–6.

[28] ECF No. 102 at 8.

[29] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[30]  If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[31]

Who bears the burden of proof on the factual issue in question is important.  When the party moving for summary judgment would bear the burden of proof at trial (typically the plaintiff), "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial."[32]  Once the moving party establishes the absence of a genuine issue of fact on each issue material to its case, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense."[33]  When instead the opposing party would have the burden of proof on a dispositive issue at trial, the moving party (typically the defendant) doesn't have to produce evidence to negate the opponent's claim; it merely has to point out the evidence that shows an absence of a genuine material factual issue.[34]  The movant need only defeat one element of the claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[35]  "When

---

[30] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[31] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

[32] *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir.1992) (citation and quotations omitted)).

[33] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.1991) (citation omitted).

[34] *See, e.g., Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[35] *Celotex*, 477 U.S. at 322.

simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[36]

## Discussion

Plaza asserts three causes of action: (1) breach of contract stemming from Travelers's denial of coverage for physical damage, (2) a contract claim for denial of lost business income, and (3) a claim for contractual breach of the implied covenant of good faith and fair dealing.[37] Travelers moves for summary judgment on all claims, while Plaza seeks summary judgment only on its two breach-of-contract claims. Because both sets of briefing raise largely overlapping issues, I consolidate the arguments and address each claim (rather than each motion) in turn. But I first address Travelers's threshold argument that all the claims are infirm because Plaza failed to satisfy a condition precedent to coverage. And because I ultimately deny Travelers's motion to strike various exhibits that Plaza relied on in its briefing, I address those evidentiary issues last.

## I. The policy did not clearly create a condition precedent to coverage that required Plaza to preserve the tarp that covered the pool.

Travelers first contends that its contractual duty to cover Plaza's losses never arose because Plaza failed to satisfy a condition precedent in the policy to coverage: preserving the tarp that Breslin used to cover the hole resulting from the pool's removal.[38] This argument centers on a provision in the policy setting forth Plaza's "duties in the event of loss or damage":

---

[36] *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

[37] ECF No. 91 (operative complaint).

[38] ECF No. 101 at 10–14; ECF No. 109 at 10–12.

e.     Take all reasonable steps to protect the Covered Property from further damage, and keep a record of expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. . . . *Also, if feasible, set the damaged property aside and in the best possible order for examination.*

. . . .

g.     As often as may be reasonably required, *permit the Company to inspect the property and records proving the loss or damage* and examine the Insured's books and records.

*Also permit the Company to take samples of damaged and undamaged property* for inspection, testing, and analysis.[39]

Travelers asserts that Plaza failed to comply with this provision—which Travelers argues forms a condition precedent to coverage—because Plaza didn't preserve the white "Hay Tarp" that Breslin used to cover the pool hole and thus didn't give Kim (the insurance adjuster who first arrived after the storm) the opportunity to inspect the tarp. Plaza first counters that Travelers, by not citing the purported failure to satisfy a condition precedent in its letter denying Plaza's claim, has engaged in "sandbagging" and has thus waived this argument.[40] But an insurer does not automatically waive a ground for denying coverage by not including it in its letter to the insured.[41] Rather, the insured must show that it was misled by the denial letter[42] and that the insurer engaged in some form of misconduct, such a failing to investigate the claim.[43]

---

[39] ECF No. 103-1 at 91 (emphasis added).

[40] ECF No. 110 at 11; *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1560 (9th Cir. 1991) ("[T]he waiver doctrine prevents an insurer from 'sandbagging' the insured by constantly raising additional exclusions.").

[41] *Id.*

[42] *Id.*

[43] *Vitale v. Jefferson Ins. Co. of New York,* 5 P.3d 1054, 1059 (Nev. 2000) (adopting the Ninth Circuit's rationale in *Intel*).

Plaza hasn't attempted to show that Travelers engaged in misconduct, and there is no evidence to suggest that Travelers's failure to cite this condition-precedent issue in its denial letter was the result of a dilatory or inadequate investigation into the facts of this case. Instead, it appears that Travelers did not initially know about the white tarp because, as it asserts, its adjuster was never shown that particular tarp after the storm. Travelers therefore hasn't waived its right to raise this issue as a reason for excluding coverage.

Plaza next argues that, because it is unclear whether the white tarp was used at any point during the storm, summary judgment is improper for this defense.[44] Although it is undisputed that Breslin purchased a white Hay Tarp nearly two months before the storm,[45] Plaza highlights the fact that only blue tarps were covering the pool hole by the time Kim arrived on the Plaza's roof.[46] To explain the apparent confusion about how many and what types of tarps were used, Plaza points to the deposition of Daniel Weatherbie, a Breslin employee brought in to help with storm preparations[47] who Plaza asserts testified that a white tarp *covered* the blue tarp—i.e., that there were multiple tarp layers.[48] Weatherbie's testimony, however, adds more murk than clarity; though he stated that "[t]wo different kind[s] of tarps" covered the pool when he arrived after the storm, he never testified that they were layered, and he described the tarps as

---

[44] *E.g.*, ECF No. 110 at 13–14.

[45] ECF No. 103-1 at 25–26 (receipt for white "Polymax Premium Hay Tarp" measuring 48x60 feet).

[46] ECF No. 101-7 at 3, ¶6 (Kim's Decl.: "At the time of my inspection, tarpaulins were draped over a large hole in the roof where I was told a swimming pool had been removed as part of a renovation project. The tarpaulins I saw were light blue in color."); ECF No. 112-1 at 13 (a photo taken in the evening of April 9 after the storm (ECF No. 112-1 at 10) showing one or more tarps over the pool that appear to be a shade of blue but are certainly not white).

[47] ECF No. 101-11 at 4 (Weatherbie explaining that he had never been to the Plaza rooftop project site until April because the storm preparations were an "[a]ll hands on deck" situation).

[48] ECF No. 110 at 6.

"[s]hredded tarps and blue tarps and a brown or grayish tarp."[49]  But Weatherbie couldn't tell

how many tarps covered the pool because they were "mostly torn and in pieces,"[50] and neither

Plaza nor any of the other deposed witnesses have ever mentioned a tarp colored anything other

than white or blue.

Other Breslin employees who had worked directly on the rooftop renovation provided

clearer explanations of what tarps covered the pool hole.  Craig Pasco testified that, after the

white "farm tarp"[51] failed, it was replaced with "two blue tarps" instead of another farm tarp.[52]

Kevin Owens similarly testified that he (on behalf of Breslin) "bought one specific tarp" that was

used to cover the hole "every day" but that there were backup tarps.[53]  Although Owens didn't

initially remember the color of any of these tarps,[54] he later testified that a white tarp was

covering the pool right before the storm.[55]  Indeed, when Owens was shown a picture of blue

tarps covering the pool hole that was taken the evening of April 9 after the storm had passed, he

reiterated that the white tarp was in place before the storm hit.[56]  And when asked what happened

to the white tarp between the storm's arrival and the picture being taken, Owens explained that

"[t]here was nothing left" of the tarp because it "was shredded" and thus likely thrown away or

---

[49] ECF No. 112-3 at 8–9 (Weatherbie Depo.).

[50] *Id.*

[51] The white tarp is at various points referred to as both a farm tarp and a hay tarp.  *See* ECF No. 110-11 at 38.

[52] ECF No. 112-2 at 8–9 (Pasco Depo.).

[53] ECF No. 112-1 at 4–5 (Owens Depo.).

[54] *Id.*

[55] ECF No. 110-11 at 36–37.

[56] *Id.* at 37; *see also* ECF No. 112-1 at 13 (the photo cited in the deposition excerpt: Breslin Exhibit 69).

moved to the adjacent rooftop tennis court.[57]  In sum, almost all the evidence demonstrates that

the blue tarps were only used to cover the pool hole after the white tarp was shredded and any

debris was discarded or set aside.

But I need not decide if Weatherbie's muddled testimony creates a dispute of fact as to

whether Breslin ever used the white tarp—and thus failed to provide it to Travelers's adjuster—

because two issues preclude me from granting Travelers summary judgment based on its

condition-precedent argument.  First, the policy requires Plaza to set aside damaged property

only "if feasible,"[58] thus making the question of whether Plaza complied with this provision one

of fact.  And based on Owens's testimony that "[t]here was nothing left" of the tarp, a reasonable

jury could find that it wasn't feasible for Plaza or Breslin to set aside whatever scraps remained

in the midst or aftermath of the storm, especially given that the rain water entering the building

likely presented a far more pressing concern.

This feasibility question will not, however, proceed to trial because the policy language

that Travelers highlights does not create a condition precedent to coverage.  Although, under

Nevada law, a policy provision need not include the words "condition precedent" to create one, it

must be "amply clear" from the policy's language that the duty imposed by the provision is a

condition of coverage.[59]  This rule comports with the principle that "any ambiguity or

---

[57] ECF No. 110-11 at 37–38.  Citing to Owens's declaration, Plaza also argues that, even if the white tarp was used, the undisputed evidence shows that it was set aside on the tennis court and thus available to Travelers's adjuster to inspect when he arrived two days after the storm.  ECF No. 110 at 12, 16.  But as seen from this Owens deposition excerpt, it is also possible that the white tarp was thrown away before Kim arrived.

[58] ECF No. 103-1 at 91.

[59] *See Las Vegas Star Taxi, Inc. v. St. Paul Fire & Marine Ins. Co.*, 714 P.2d 562, 562 (Nev. 1986); *see also S.B. Corp. v. Hartford Acc. & Indem. Co.*, 100 F.3d 964 (9th Cir. 1996) (unpublished) ("*Star Taxi* holds that an insurance policy's notice requirement is a condition precedent, even if not expressly defined as such in the text of the document, if the policy language makes it 'amply clear' that timely notice is a condition of coverage and must be carried

1    uncertainty in an insurance policy must be construed against the insurer and in favor of the

2    insured."[60]  Here, the provision that Travelers relies on refers to Plaza taking "reasonable steps to

3    protect the Covered Property from further damage," and at the end of the same paragraph—

4    almost as an afterthought—discusses setting aside "damaged property."  But it is unclear whether

5    damaged property refers only to "Covered Property" or to any tangible items used as a remedial

6    measure to protect Covered Property from damage.  This distinction is underscored by the fact

7    that Breslin, not the insured, purchased the tarps to protect the property at issue from water

8    damage, and Plaza is not seeking coverage for the loss of the tarps themselves.  Given this

9    ambiguity, setting aside the shredded tarps (if feasible) for Travelers is not a condition precedent

10   to coverage.  I therefore turn to Plaza's claims.

11

**II.     Neither side has demonstrated that it is entitled to summary judgment on Plaza's
12            breach-of-contract claim for physical damage to its central building.**

13          Travelers argues that the rain limitation to its policy with Plaza precludes coverage.

14   Plaza responds and argues in the alternative that, even if the limitation applies, the tarp and other

15   measures used to protect the roof constituted a temporary structure used to make repairs or

16   alterations to the roof and are therefore covered property under a different policy provision.

17   Finally, Plaza proactively argues that the faulty-workmanship exclusion—which Travelers cited

18   in its denial-of-coverage letter but did not raise in moving for summary judgment—does not

19   preclude me from granting summary judgment in Plaza's favor.

20

_____

21   out in order to render the insurer liable under the policy."); *cf. Ins. Co. of Pa. v. Associated Int'l
22   Ins. Co.*, 922 F.2d 516, 524 (9th Cir. 1990) ("[U]nder California law, contractual provisions are
     not deemed to be conditions precedent unless stated in conspicuous, unambiguous, and
23   unequivocal language." (quotation marks, citation, and ellipsis omitted)).

[60] *Benchmark Ins. Co. v. Sparks*, 254 P.3d 617, 621 (Nev. 2011) (citation omitted).

**A.   A reasonable jury could decide either way whether the weatherproofing measures constituted a roof and thus whether the rain limitation applies.**

Because the rain limitation under Plaza's policy with Travelers operates as an exception to coverage, it is necessary to first describe how the policy generally determines coverage. The "insuring agreement" provision explains that Travelers "will pay for direct physical loss or damage to Covered Property . . . caused by or resulting from a Covered Cause of Loss," which is defined as "risk of direct physical loss *unless* the loss is excluded" under the policy's list of "Exclusions" or "Limitations."[61] The policy then provides a list of covered property, which includes "the buildings and other structures at the Insured's premises . . . ."[62] It is undisputed that the Plaza's central building is covered property. So, any physical damage to that building is covered unless specifically excluded or limited.

Travelers contends, as it has since its original denial letter, that the rain limitation to its policy precludes coverage for water damage caused by this storm. That provision states that Travelers "will not pay for loss or damage to . . . the interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not . . . ."[63] This limit thus precludes coverage for damage to *specific types* of otherwise covered property—the building's interior and personal property within it—but only if that damage results from *specific causes*, including rain. The policy then lists two exceptions to this limitation, one of which Plaza argues is applicable to its claim: Travelers will cover damage to a building's interior caused by rain if the building "first

---

[61] ECF No. 103-1 at 37 (emphasis added).

[62] *Id*.

[63] *Id*. at 71.

1   sustains damage by a Covered Cause of Loss to its *roof* or walls through which the

2   rain . . . enters . . . ."[64]  Because the policy doesn't categorically exclude rain, wind, or hail as

3   covered causes of loss, any water damage to the building's interior caused by rain is covered if

4   rain, wind, or hail *first* damages the building's roof in a way that allows the rain to enter its

5   interior.

6          The parties agree that this is how the rain-limitation works, so the crux of their dispute is

7   whether the tarp and other weatherproofing measures that Breslin used on the building's roof

8   constitute part of that roof under the policy.  In other words, Plaza has never asserted that the

9   storm damaged any part of the rooftop decking that wasn't already partially ripped up by Breslin,

10  and it asserts that the rain entered its building through the tarp only after it was torn open by a

11  combination of rain, wind, and hail.  So, those causes of loss satisfy the exception to the rain

12  limitation—and are thus afforded coverage—only if the tarp that the storm damaged was acting

13  as the building's roof at the time.

14         The parties also agree that this question is largely framed by the Nevada Supreme Court's

15  decision in *Fourth Street Place v. Travelers Indemnity Company*, which dealt with a materially

16  identical rain limitation in a Travelers policy that insured the owner of a Las Vegas office

17  building.[65]  The insured hired a contractor to repair the building's roof, and the contractor

18  removed its waterproof membrane.  Before the membrane could be replaced, "substantial

19  rainfall" passed over the building.[66]  The contractor attempted to cover the exposed portion of the

20  roof with tarps, but the wind blew them away, leaving the building exposed to the continued

21

22  [64] *Id.* (emphasis added).

23  [65] *Fourth St. Place v. Travelers Indem. Co.*, 270 P.3d 1235, 1237 (Nev. 2011), *as modified on reh'g* (May 23, 2012).

    [66] *Id.*

rain.[67]  The building's interior incurred substantial damage, and the insured made a claim on its Travelers policy, which (like in this case) provided coverage for all damage to the building unless limited or excluded.[68]  In denying coverage, Travelers relied on, among other things, the rain limitation, arguing that a "temporary device" like a tarp could not constitute a roof.[69]

But the court ultimately rejected this type of bright-line durational metric for whether a protective measure could constitute a roof and instead adopted the "functional definition" crafted by the Oregon Supreme Court in *Dewsnup v. Farmers Insurance Co. of Oregon*.[70]  Faced with a similar rain limitation and a roof that, prior to a storm, had been replaced with a "layer of polyethylene plastic that was secured to the wood sublayer with a system of staples, roof tacks, and wooden bats," the *Dewsnup* court held that a covering can constitute a roof if it is "sufficiently durable to meet its intended purpose: to cover and protect a building against weather-related risks that reasonably may be anticipated."[71]  But the Nevada Supreme Court didn't have cause to apply this definition in *Fourth Street* because the insured's contractor placed the tarp on the exposed roof only after the rain had already begun falling and after "significant damage had already occurred."[72]  The rain limitation therefore applied, excluding coverage.

---

[67] *Id.*

[68] *Id.*

[69] *Id.* at 1240.  Unlike the rain limitation in this case, the exception to the limitation in *Fourth Street* required that the roof be damaged specifically by wind or hail—rather than by any covered cause of loss.  *Id.*  This is a distinction without a difference for this case because the parties do not dispute that rain, wind, and hail are generally covered causes of loss and that these storm elements damaged the tarp used on the Plaza.

[70] *Dewsnup v. Farmers Ins. Co. of Or.*, 239 P.3d 493 (Or. 2010) (en banc).

[71] *Fourth St. Place*, 270 P.3d at 1240–41 (quoting *Dewsnup*, 239 P.3d at 499).

[72] *Id.* at 1241.

Here, by contrast, Breslin installed the tarp and other waterproofing measures on the Plaza's roof by the time the storm hit, so the parties devote much of their briefing to arguing whether these measures were sufficiently durable to protect the Plaza from the anticipated storm. If so, these measures constituted a roof under Plaza's policy and the rain limitation would not apply. But what weather conditions were *reasonably* anticipated before April 9 and whether the weatherproofing measures taken were *sufficiently* durable to protect against those conditions are questions of fact.[73] So, to warrant summary judgment on this claim, either party must show that, based on the record evidence, no reasonable jury could find against it on these questions. Neither side has satisfied this burden.

In both moving for and opposing summary judgment on this claim, Plaza primarily points to the extensive efforts it went to ensure all the exposures on the roof were covered, weighted down, and to some extent sealed to the rooftop.[74] It also points to Owens's conclusion that these weatherproofing measures would have withstood up to three-quarters of an inch of rain,[75] which

---

[73] *Dewsnup*, 239 P.3d at 500 ("[W]hether a particular material is 'suitable for the construction of a roof' is a factual issue for the jury. Given the record before the trial court, we cannot say that no reasonable juror could find that polyethylene sheeting, properly secured to a plywood sublayer, was not suitable to protect the house for the duration of the repair."); *id.* ("[W]e cannot say that no reasonable juror could find that securing the polyethylene sheeting to the plywood sublayer constituted a roof for the purposes of plaintiffs' homeowners' insurance policy.").

[74] Although it is undisputed that Breslin used a tar-like weatherproofing substance on portions of the Visqueen that were covering exposures other than the pool hole, Plaza implies at points that this tar was also used to seal the tarp to the rooftop deck. *See, e.g.*, ECF No. 102 at 6. Travelers challenges whether tar or other sealants were used on the tarp itself, pointing to deposition testimony from Owens that at least calls the matter into question. *E.g.*, ECF No. 109 at 7 (citing ECF No. 102-12 (Owens Depo.) at 30–33)). But although the tar's use is at best a disputed point, it is not dispositive to whether the weatherproofing measures constituted a roof. After all, Travelers has not presented evidence refuting the conclusion that almost all the rainwater entered the building through the tear in the tarp (ECF No. 110-41 at 14 (Mooney report))—as opposed to seeping in under the tarp. I therefore disregard the tar issue for the purpose of assessing whether either party is entitled to summary judgment.

[75] *E.g.*, ECF No. 110 at 22.

exceeds the average April rainfall for Las Vegas cited by either party's proposed metrological expert.[76] But Owens is not one of Plaza's proposed expert witnesses, and because his conclusion draws on specialized knowledge rather than the personal knowledge of a lay witness, I do not take his opinion into account.

Conversely, Travelers points to what measures it believes Plaza should have taken, including placing wood or metal below the tarp to provide it structural support and prevent the tarp from sagging from the weight of accumulating rainwater and the wind.[77] In support, Travelers cites to the *Dewsnup* court's conclusion that "protection from the weather" includes a requirement of "structural integrity" and that the plastic sheeting and other coverings in that case were secured to a plywood sublayer by various means.[78] But structural integrity is a relative concept, subsumed by the question of whether the weatherproofing measures are sufficiently durable to protect against the anticipated weather. A tarp tied down taut over an opening might have structural integrity depending on the weather that it is expected to withstand. But that is a jury question.

And although neither party discusses the conclusions reached by their proposed expert witnesses on this issue in almost any detail, the tension between their findings underscores the need for a jury to determine whether the weatherproofing measures were sufficiently durable.

---

[76] *See supra* note 16.

[77] ECF No. 101 at 21. Plaza's proposed expert witness on Breslin's weatherproofing methods mentions in his original report that the bottom of the tarp was "supported by some ropes (or similar lines) installed across the narrow width of the pool opening at approximately 10–15 foot intervals which created separate panels along the length of the pool." ECF No. 110-41 at 14. But none of the Breslin or Plaza employees with personal knowledge of the weatherproofing measures implemented testified or attested to ropes being used to support the tarp from below— as opposed to tying the tarp down—and Plaza never responds to Travelers's argument regarding the lack of structural support. I therefore disregard this evidence.

[78] *Dewsnup*, 239 P.3d at 497, 499.

Travelers's proposed expert concludes that the measures "were insufficient to protect against a modest rain fall or any noteworthy wind, to say nothing of the heavy rains and high winds that can accompany thunderstorms."[79] He further states that he has never seen a tarp used to cover a large opening because they are "thin and tend to tear and puncture rather easily."[80] Plaza's proposed expert responds that "[t]arps are commonly used for weather protection and are, in fact, quite strong."[81] Assuming both proposed witnesses are qualified as experts for trial,[82] the gulf between their proposed testimony demonstrates that a jury could decide the durability question in either party's favor.[83]

Nonetheless, Plaza adamantly argues that the term "roof" in the policy is ambiguous and that I must therefore construe the exception to the rain limitation in its favor.[84] In support, it points to conduct by Travelers employees and agents during the investigation of Plaza's claim

---

[79] ECF No. 109-2 at 9 (Downey Decl.).

[80] ECF No. 110-41 at 10 (Mooney rebuttal report quoting Downey's report).

[81] *Id.*

[82] Plaza argues in a footnote in a reply brief that Travelers's proposed expert, for multiple reasons, "lacks the requisite expertise to opine on what may constitute a roof or the adequacy of Plaintiffs' protections." ECF No. 114 at 12–13 n.4. But I decline to reach substantive arguments addressed only in footnotes, especially where, as here, the opposing party does not have an opportunity to respond. If Plaza wished to preclude this proposed expert testimony at the summary-judgment stage, it should have moved to strike it.

[83] Travelers also argues that summary judgment is warranted in its favor because it is undisputed that, although the tarps that Breslin purchased were larger than the pool hole, they could not and did not cover the entire portion of the rooftop deck that Breslin had partially torn up, which measured 47x75 feet. *E.g.*, ECF No. 101 at 21. Travelers intimates that the rain could have entered the building through the exposed "porous" sheets of corrugated metal surrounding the hole's perimeter. But the undisputed evidence also shows that these types of openings were sealed with Visqueen and other means. And Travelers hasn't highlighted any evidence refuting the conclusion by Plaza's proposed expert that "almost all the water entered the building below through the torn tarp opening over the pool" and "[l]ittle to no water entered from the roof decking area . . . ." ECF No. 110-41 at 14 (Mooney initial report).

[84] *E.g.*, ECF No. 102 at 18–21.

that Plaza contends demonstrates that Travelers admitted liability. Plaza also highlights

deposition testimony from Travelers employees in which, according to Plaza, they acknowledged

that the limitation's language is ambiguous. Travelers disagrees with Plaza's portrayal of this

evidence, but I need not venture into that dispute because it is irrelevant; whether the rain

limitation is ambiguous is a question of law[85] and thus not dependent on the extrinsic factual

disputes that Plaza raises.[86] Moreover, the fact that a term is undefined in an insurance policy

does not mean that it is by default ambiguous.[87] And given that the Nevada Supreme Court in

*Fourth Street* adopted a roof definition stemming from the *Dewsnup* court's analysis of the

common understanding of that word, I cannot conclude that the word is ambiguous when used in

a materially identical insurance policy. Accordingly, a jury must decide whether the

weatherproofing measures constitute a roof by determining whether these measures were

sufficiently durable to protect Plaza's central building from the weather conditions that Plaza

should have reasonably anticipated.

### B. The temporary-structure provision does not independently extend coverage.

Plaza separately argues that, even if the rain limitation applies, it is still entitled to

summary judgment because a different provision in the policy extends coverage to "temporary

structures, on or within 1,000 feet of the Insured's premises, used for making alterations or

---

[85] *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013).

[86] *See Fourth St. Place*, 270 P.3d at 1239 ("Whether a term is ambiguous depends on whether it creates reasonable expectations of coverage as drafted. . . . To determine whether a term is ambiguous, it should not be viewed standing alone, but rather in conjunction with the policy as a whole in order to give a reasonable and harmonious meaning and effect to all its provisions." (internal quotation marks and citations omitted)).

[87] *See, e.g.*, *id*. at 1241–42 (finding that the term "workmanship" was not ambiguous even though the policy did not define it).

repairs to the buildings or structures."[88]  Plaza contends that the policy "considers temporary

portions of a structure co-equally with a permanent roof or wall . . . ."[89]  But Plaza's reliance on

this language is misplaced because it is merely part of the policy's definition of a "building,"

which falls under the policy's list of what constitutes "Covered Property."[90]  And as discussed

above, the policy provides coverage only if covered property is damaged by a covered cause of

loss.

Indeed, *Fourth Street* addressed a nearly identical argument, wherein the insured

contended that similar policy language extended coverage for temporary structures and

incomplete repairs.[91]  But the Nevada Supreme Court held that, "even if incomplete repairs were

covered by the Policy, this would not provide an exception to the requirement that the Building

first sustain actual damage to its roof or walls by wind or hail before Fourth Street may recover

for interior damage caused by rain."[92]  Likewise, the temporary-structure provision here does not

provide coverage independent of whether a policy limitation precludes a cause of loss.  So, if a

jury finds that the rain limitation applies, coverage is precluded regardless of whether the tarp

and other weatherproofing measures constitute covered property.

### C. The faulty-workmanship exclusion would not affect the jury's determination of whether the rain limitation applies.

Although Travelers did not move for summary judgment based on the policy's faulty-

workmanship exclusion that it cited in its denial letter, Plaza argues that this exclusion does not

---

[88] ECF No. 102 at 17; ECF No. 103-1 at 37 (policy).

[89] ECF No. 114 at 7 (emphasis added).

[90] ECF No. 103-1 at 37.

[91] *Fourth St. Place*, 270 P.3d at 1241.

[92] *Id.*

preclude summary judgment in Plaza's favor.  Because I deny both parties summary judgment on Plaza's first claim, I need not address this exclusion.  But in the interest of assessing what issues remain for trial, I will explain why the exclusion is dependent on the jury's decision on whether the rain limitation applies and therefore cannot, on its own, determine whether Plaza is afforded coverage under the policy.

The exclusion states that Travelers "will not pay for loss or damage caused by or resulting from . . . [f]aulty, inadequate[,] or defective . . . [p]lanning, . . . [d]esign, . . . [or] workmanship . . . ."[93]  In arguing that the exclusion applies to Plaza's claim, Travelers highlights its proposed expert witness's conclusion that Breslin fell below the "industry standards of care" in how it removed the pool and decking from the Plaza's rooftop.[94]  For instance, this witness asserts that Breslin poorly planned the renovation project by removing the pool almost two months before it intended to install the replacement, thus exposing the building to a prolonged danger of rain-based water damage.[95]  Plaza's proposed expert responds to these critiques.[96]

But this dispute is ultimately immaterial to determining coverage in this case because the faulty-workmanship exclusion also has an exception: if the faulty workmanship "results in a Covered Cause of Loss," then the "exclusion does not apply to loss or damage caused by that resulting Covered Cause of Loss."[97]  Stated another way, if the damage resulted in a covered cause of loss, it doesn't matter whether faulty planning, design, workmanship, etc. led to that damage—the loss will still be covered.  Here's what that means in this case: if a jury finds that

---

[93] ECF No. 103-1 at 48.

[94] ECF No. 109 at 26–27.

[95] ECF No. 109-2 at 5–7 (Downey Decl.).

[96] ECF No. 110-41 at 41–44 (Mooney rebuttal report).

[97] ECF No. 103-1 at 48.

Breslin's waterproofing measures did constitute a roof, then as discussed above, the rain that entered and damaged the building's interior would be a covered cause of loss. Under that scenario, even if the jury also found that Breslin's poor planning created the risk that the rain would enter the building in the first place, the *exception* to the faulty-workmanship exclusion would apply because the faulty planning resulted in a covered cause of loss. That exclusion therefore wouldn't separately bar coverage. So, under this scenario, the faulty-workmanship exclusion doesn't alter the outcome.

Conversely, if a jury determines that the tarp and other measures aren't a roof, then the rain limitation does apply, the rain wasn't a covered loss, and Travelers correctly denied coverage. It therefore doesn't matter under this second scenario whether faulty workmanship resulted in the rain entering the building because coverage is precluded under the rain limitation anyways. The faulty-workmanship exclusion is redundant under this scenario because it also doesn't alter the outcome.[98]

The upshot of these two scenarios is this: even if the jury determined that Breslin's workmanship was faulty, the question of whether the policy affords coverage will always turn on whether the rain limitation applies; the faulty-workmanship exclusion has no impact.[99] But

---

[98] *See Fourth St. Place*., 270 P.3d at 1243 (finding (1) that the rain limitation applied because the tarp wasn't in place before the rain started and that the rain therefore wasn't a covered loss and (2) although the contractor's poor planning (i.e., faulty workmanship) allowed the rain to enter the building, the damage wasn't caused by a covered cause of loss and both the faulty-workmanship exclusion and the rain limitation barred coverage).

[99] For this reason, the doctrine of efficient proximate cause, which the Nevada Supreme Court adopted in *Fourth Street Place*, has no bearing. Under this doctrine, "where covered and noncovered perils contribute to a loss, the peril that set in motion the chain of events leading to the loss or the 'predominating cause' is deemed the efficient proximate cause or legal cause of loss." *Fourth St. Place*, 270 P.3d at 1243. But "having both a covered and noncovered cause of loss is a prerequisite to applying the doctrine of efficient proximate cause . . . ." *Id*. at 1244. If a jury found that Breslin's work was faulty and that the rain limitation applies, then the faulty-workmanship exclusion also applies, and there are two non-covered causes of loss. If the jury

although Plaza is correct that this issue alone would not have precluded me from granting it

summary judgment on its first claim, I see no reason to grant summary judgment on this issue

given that the rain-limitation question must proceed to the jury. This does not, however, bar

Plaza from later moving in limine to exclude faulty-workmanship evidence from trial as

irrelevant or otherwise inadmissible. But I make no predictions now on how I would rule on that

issue if raised.

\* \* \*

Plaza's breach-of-contract claim for property loss will proceed to trial, where a jury must

determine whether Breslin's waterproofing measures constituted a roof under the policy and thus

whether the rain limitation precludes coverage for the storm-caused damage to the Plaza's

interior. Neither the temporary-structure provision nor the faulty-workmanship exclusion is

relevant to that determination.

## III. Travelers is granted summary judgment on Plaza's breach-of-contract claim for lost business income.

Plaza's second contract claim is premised on its prediction that, once it begins repairs to

its central building, it will need to "shut down and suspend operations for twelve months,"

resulting in nearly $30 million in lost business income.[100] Plaza relies on the policy's "Business

Income Coverage" provision, which states that Travelers "will pay for the actual loss of Business

Income . . . sustained by the Insured due to the necessary 'suspension' of the Insured's

---

found that the rain limitation doesn't apply, then the exception to the faulty-workmanship
exclusion kicks in and the work is also a covered cause of loss. So, neither scenario yields a
covered and uncovered cause of loss.

[100] ECF No. 91 at 7–8.

'operations' during the 'period of restoration.'"[101]  As relevant here, the policy defines the period of restoration as beginning "with the date and time of the direct physical loss or damage to property at the insured premises caused by or resulting from a Covered Cause of Loss" and ending "when the property should be repaired, rebuilt[,] or replaced with reasonable speed and similar quality . . . ."[102]

Travelers moves for summary judgment on this claim, arguing that this provision, by referring to "actual income," only compensates an insured for business income that it has already lost during its restoration—not prospective profits.  And as Travelers highlights, Plaza's proposed forensic-accounting expert acknowledged that his damage calculations are predictions of how much income Plaza will lose when it eventually begins the restoration process.[103]  Plaza doesn't refute this characterization of its damages.  Nor does it squarely respond to Travelers's interpretation of the phrase "actual income."[104]  After careful examination of the provision, I agree with Travelers that the policy provides coverage only for the lost profits that Plaza actually incurs by suspending operations as a result of a covered cause of loss—not its prospective loss.  Because it is undisputed that Plaza has not yet suspended operations, it is not yet entitled to coverage and Travelers has not breached the policy in this regard.  I therefore grant Travelers summary judgment on this claim.

---

[101] ECF No. 103-1 at 51.

[102] *Id*. at 60.

[103] ECF No. 101-12 at 5 (Logiudice Depo.); *see also* ECF No. 110 at 25 ("Plaintiff here seeks merely the benefit of its' [sic] bargain—payment for the actual losses that will be incurred during the time taken to repair its premises.  Defendant has delayed these necessary repairs by its own breach of its contract with Plaintiffs, i.e., its refusal to pay Plaintiffs' [sic] the funds to which they are entitled . . . .").

[104] ECF No. 110 at 24–25.

But before moving to the final claim, I briefly address Travelers's footnote regarding the period of restoration—the only point that Plaza directly responds to. Travelers contends that, because this period began on April 9, 2016, when the storm damage occurred, and Plaza alleges that it will need to suspend operations for 12 months, the period of restoration ended in April 2017.[105] Plaza appears to have interpreted this statement as an argument that it is precluded from ever seeking coverage or damages for the business income that it will lose when it eventually suspends operations to make repairs to its central building. I therefore clarify that the scope of my grant of summary judgment on this claim is narrow: Plaza's claim is simply premature because it has not yet incurred an actual loss of business income from suspended operations. I make no findings as to whether (1) the period of restoration has run, (2) Plaza may make a claim on its policy when it eventually does suspend operations, and (3) Travelers would breach the policy if its denies the claim at that point. Because the policy only covers business income lost during a suspension of operations resulting from a covered cause of loss, all these issues hinge (at a minimum) on the jury's determination of whether the rain limitation applies.

## IV. Travelers is also granted summary judgment on Plaza's claim for contractual breach of the implied covenant of good faith and fair dealing.

Travelers also seeks summary judgment on the claim for breach of the implied covenant of good faith and fair dealing and on Plaza's prayer for attorneys fees as a measure of damages under that claim. Travelers contends that, because Plaza has asserted a breach-of-contract claim, it is a precluded from pursuing a claim for a contractual breach of the implied covenant. This argument is premised on the fact that the former cause of action stems from a party's breach of a contract's terms, while the latter is based on a party complying with the contract's literal terms

---

[105] ECF No. 101 at 23.

but "deliberately counterven[ing] the intention and spirit of the contract . . . ."[106]  These claims

are thus contradictory.  And although Travelers acknowledges that a party may plead claims in

the alternative, it argues that Plaza hasn't pled any facts in its complaint nor advanced evidence

that would show that, despite complying with the policy's terms, Travelers acted in a way that

breached the implied covenant of good faith and fair dealing.

Plaza does not respond to this argument and instead contends that it is asserting a claim

for *tortious* breach of the implied covenant, claiming that the title to its third cause of action is a

mere typo.[107]  In reply, Travelers harkens back to the hearing on Plaza's motion to amend its

complaint to add a claim for breach of the implied covenant.  It contends that I precluded Plaza

from adding a claim sounding in tort and allowed Plaza to add only a contract-based claim.[108]

Plaza, in its proposed surreply,[109] counters that Travelers has mischaracterized my oral ruling

and that I only precluded it from seeking punitive damages.  Plaza further contends that I was

simply "imprecise" when I stated that the facts that it had "identified for me [in the hearing] and

in the reply brief do lay out or support a plausible claim under the *Iqbal* and *Twombly* standards

for *contractual* breach of the implied covenant of good faith and fair dealing under Nevada

law."[110]  But it is Plaza that mischaracterizes the hearing, as I specifically paused during the

proceeding to make clear to its out-of-state counsel that Nevada law distinguishes between a

contractual and a tortious breach of the implied covenant.[111]  My use of the qualifier

---

[106] *Hilton Hotels Corp. v. Butch Lewis Prods., Inc*., 808 P.2d 919, 922–23 (Nev. 1991).

[107] ECF No. 110 at 26 & n.11.

[108] ECF No. 70 (motion to amend); ECF No. 90 (hearing transcript).

[109] I grant Plaza's motion for leave to file a surreply.  ECF No. 116.

[110] ECF No 116-2 at 4 (emphasis added) (quoting ECF No. 90 at 29).

[111] ECF No. 90 at 6 (Q: "So, when you say 'bad faith,' so this is breach of the implied covenant of good faith and fair dealing?"  A: "That's correct, Your Honor."  Q: "Tortious or contractual?"

"contractual" while announcing my ruling at the hearing's end was not a slip of the tongue but rather an extension of this earlier exchange. Accordingly, I granted Plaza leave to add only a contractual claim for breach of the implied covenant of good faith and fair dealing, not a tortious one.

Travelers is also correct that Plaza did not plead facts in its added claim to demonstrate that, even if Travelers complied with the policy's terms, it nonetheless breached the implied covenant. Nor has Plaza highlighted evidence that would support such a theory (if properly alleged). I therefore grant Travelers summary judgment on this claim. And because Plaza sought attorneys fees as an element of damages—rather than as a cost of litigation[112]—only on this claim,[113] Travelers's request for summary judgment on that form of damages is moot.

## V. Travelers's motion to strike is denied because its evidentiary objections are without merit.

Finally, I briefly explain why Travelers's evidentiary objections[114] are without merit. It first raises several reasons why the affidavit submitted by H. Alan Mooney, Plaza's proposed expert witness on Breslin's waterproofing methods, should be stricken. Travelers argues that Plaza, in describing the measures that Breslin took to cover the rooftop, continuously cited to Mooney's affidavit and that Mooney, as an expert witness, has no personal knowledge of the

---

A: "Common law, Your Honor. We haven't specified contractual. It could be, theoretically, both; but we didn't plead a -- we didn't plead the statute. . . ." Q: "No, no, no. I realize you haven't pled the statute."); *id.* at 7 ("But there are two ways that that can go under Nevada law: It can go just plain contractual or it can go tortious in which case you need, you know, this special relationship and you need the additional facts to get you punitive damages.").

[112] *See Sandy Valley Assocs. v. Sky Ranch Estates Owners Ass'n*, 35 P.3d 964, 969 (Nev. 2001), receded from on other grounds by *Horgan v. Felton*, 170 P.3d 982 (Nev. 2007).

[113] ECF No. 91 ¶ 62.

[114] ECF No. 113 (motion to strike).

facts of this case. But though Plaza does frequently refer to this affidavit, its briefing always includes a string citation to the depositions and affidavits of the Plaza and Breslin employees that even Travelers acknowledges had personal knowledge[115] of the waterproofing measures taken.[116] And in addressing Plaza's claim for property damage, I never relied on Mooney's affidavit or report for information on what waterproofing measures Breslin took—as opposed to examining his proposed expert testimony regarding the efficacy of those measures.[117]

Travelers also argues that Mooney's affidavit should be disregarded under the sham-affidavit rule, which "prevents a party who has been examined at length on deposition from raising an issue of fact simply by submitting an affidavit contradicting his own prior testimony . . . ."[118] But any tension between Mooney's affidavit and deposition in the examples cited are not as severe as Travelers contends and are more appropriately addressed during cross examination at trial than in a motion to strike at the summary-judgment stage.[119]

Travelers also seeks to exclude a letter by Owens that is attached to his declaration, arguing that it is inadmissible hearsay. And it also objects to the reports authored by Plaza's two

---

[115] ECF No. 112 at 8.

[116] *E.g.*, ECF No. 110 at 4.

[117] Indeed, I disregarded Mooney's mention of ropes supporting the underside of the tarp because no witness with personal knowledge had testified or attested to this use of ropes. *See supra* note 77.

[118] *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (internal quotation marks, citations, and alternations omitted).

[119] *E.g.*, ECF No. 113 at 5–6 (Mooney attesting in his affidavit that the tarps used were in "new or newer" condition based on the fact that Breslin purchased them recently but acknowledging in his deposition that he didn't definitively know how old the tarps were or if they were in mint condition). Travelers also argues that I should exclude two paragraphs of Owens's declaration under the sham-affidavit rule. But as with Mooney's testimony, I don't find that discrepancies between Owens's declaration and deposition are severe enough to warrant that type of relief. And Travelers's concern with Owens's declaration centers on whether the tarp was sealed to the rooftop with tar or other materials, an issue that I found was immaterial. *See supra* note 74.

proposed expert witnesses because they are unsworn. All of these objections are thus premised on Travelers's argument that the exhibits are not admissible and therefore not properly considered at summary judgment. But that is no longer the standard. The 2010 amendment to Federal Rule of Civil Procedure 56 "eliminate[d] the unequivocal requirement" that evidence must be admissible in its present *form* in order to be considered at summary judgment.[120] Instead, the rule mandates that the *substance* of the proffered evidence be admissible at trial.[121] There is little doubt that Plaza will call Owens and the proposed expert witnesses to testify at trial. Owens will be able to testify from personal knowledge about the waterproofing measures Breslin took that he discussed in his declaration and attached letter,[122] thus avoiding a hearsay problem.[123] And if qualified, Plaza's proposed experts would also take the stand and, under oath, discuss the conclusions reached in their reports.[124] I therefore deny Travelers's motion to strike.

---

[120] *Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016) (unpublished).

[121] *Id.*; *see also* Fed. R. Civ. P. 56 advisory comm. note to 2010 amendment; *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.").

[122] Travelers also questions whether Owens authored the letter. But I need not delve into this issue further because I never relied on this letter in determining what waterproofing measures Breslin took.

[123] *See, e.g.*, *Fraser*, 342 F.3d at 1037 ("The contents of the diary are mere recitations of events within Fraser's personal knowledge and, depending on the circumstances, could be admitted into evidence at trial in a variety of ways. Fraser could testify to all the relevant portions of the diary from her personal knowledge. Fed. R. Evid. 602. If she forgets the exact dates or the details of the event, she may be able to use the diary to refresh her recollection. Fed. R. Evid. 612.").

[124] *See, e.g.*, *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (holding that the district court erred in dismissing a "report solely because it was not sworn [and] without considering [the appellant's] argument that" the report's author "would testify to those opinions at trial and without determining whether such opinions, as testified to at trial, would be admissible").

**Conclusion**

Accordingly, IT IS HEREBY ORDERED that Travelers's motion for summary judgment **[ECF No. 101] is GRANTED in part and DENIED in part**.  Summary judgment is denied on Plaza's first breach-of-contract claim for property damage but granted on Plaza's second and third claims for breach-of-contract for lost business income and contractual breach of the implied covenant of good faith and fair dealing.  Plaza's motion for summary judgment **[ECF No. 102] is DENIED**.

IT IS FURTHER ORDERED that Travelers's motion to strike **[ECF No. 113] is DENIED** and Plaza's motion for leave to file a surreply **[ECF No. 116] is GRANTED**.

IT IS FURTHER ORDERED that this case is REFERRED to a magistrate judge for a MANDATORY SETTLEMENT CONFERENCE.  The parties' obligation to file their joint pretrial order is **STAYED until 10 days after that settlement conference.**

Dated: August 9, 2019,

_____
U.S. District Judge Jennifer A. Dorsey