**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Tamares Las Vegas Properties, LLC, et al.,

      Plaintiffs

v.

Travelers Indemnity Company,

      Defendant

Case No.: 2:16-cv-02933-JAD-NJK

**Order Denying
Motion for Attorneys' Fees**

[ECF Nos. 265, 288]

     When an April 2016 storm disrupted its rooftop-pool renovations and caused millions of dollars in flood damage to its property and operations, the Plaza Hotel & Casino in Downtown Las Vegas filed a claim with its insurer Travelers Indemnity Company—which then denied coverage. So Plaza sued Travelers, claiming that the insurance company should have covered the loss because the casino's contractor Breslin Builders had taken sufficient weatherproofing precautions, mainly by covering the void left in the roof after the old pool was demolished with a large, white hay tarp. But there was no such tarp, and that truth was revealed on the morning of the fifth day of a jury trial after Plaza's counsel was given time-lapse photos that exposed the reality that the tarp testimony at the heart of its case was just plain false.

     Travelers now asks this court to order Plaza and its trial counsel to reimburse it for the more than $2 million in fees and costs that the insurer spent defending against this specious case. The parties dispute what this time-lapse footage actually shows and whether it's as big of a deal as Travelers claims. And Plaza contends that Travelers hasn't met its burden to show that the failure to turn over these images during discovery was bad faith and not just inadvertence. For their part, Plaza's trial lawyers insist that they did a thorough pre-suit investigation, did not

violate any discovery rules, and acted ethically by terminating the case once they learned of the footage midtrial.

What transpired in this case was a failure in many respects—and a colossal waste of resources. But I cannot conclude that this situation was one entirely of Plaza's making, that Plaza and its counsel were more than merely negligent in their failure to find and turn over the time-lapse footage, or that Plaza or its counsel acted in bad faith. The information Plaza had at the time of filing this suit—largely supplied by Breslin but also adopted by Travelers' own adjusters—gave Plaza and its counsel a reasonable basis to pursue it. And while discovery mistakes were made, Travelers has not shown that they are worthy of sanctions. So although I, too, wish this case had never proceeded to trial, I deny Travelers' motion for attorneys' fees.

## Background

### A.    The April 2016 storm penetrates the exposed roof and saturates the Plaza Hotel & Casino.

In April 2016, the Plaza Hotel and Casino was deep into renovation of the pool area and sport court that sit on its rooftop deck. The project was a comprehensive one, and it required the removal of the entire pool structure, temporarily leaving a 30 x 50-foot hole in the roof above the Plaza's casino and conference center. So when a storm was predicted to hit Las Vegas on April 9, 2016, precautions needed to be made. That weatherproofing responsibility belonged to Breslin Builders, the contractor hired for the renovations. Las Vegas typically receives little rainfall, so the precautions were consistent with that expectation. After a Breslin employee who assessed those efforts noted that "any amount of wind" would compromise the Visqueen plastic

sheeting and, "[w]ith the sustained rain, we're in trouble,"[1] Breslin's superintendent Craig Pasco "redid areas of concern" and assured that the efforts were sufficient.[2]

But trouble they were in.  The storm hit that Saturday morning and was characterized as a 100-year storm event that quickly brought hail and more than an inch of rain, far surpassing what had been forecasted.[3]  The deluge poured through the open pool hole and soaked through the conference center, the eye-in-the-sky electronic-surveillance system, and the casino floor, causing millions of dollars in damage.[4]  When Plaza began assessing the soggy mess, its CEO Jonathan Jossel directed various employees to collect all photos related to the flooding damage and place them in a Dropbox folder.[5]  He also told those employees to check with their departments for any other photos, specifying that employees in security and engineering likely had some.[6]  Breslin alone supplied hundreds of images.

**B.     Travelers denies Plaza's insurance claim for the storm damage.**

Plaza notified its property insurer Travelers of the damage the very next day.  The insurance policy contained a rain exclusion stating that Travelers "will not pay for loss or damage to . . . the interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not," unless the building "first sustains damage . . . to its roof . . . through which the

---

[1] ECF No. 230 at 113:4–5.

[2] *Id.* at 114:6–7.

[3] ECF No. 228 at 190:7–10, 192:24–25, 194–196, 218:5–13.

[4] *See generally* ECF No. 220 at 243–257; ECF No. 224 at 81–139 (trial testimony describing the damage).  ECF No. 91 at ¶ 62 (amended complaint, alleging more than $15 million in property damage and more than $28 million in loss-of-business damages).

[5] ECF No. 224 at 277:4–21; ECF No. 271-3 at 108.

[6] ECF No. 271-3 at 108.

rain . . .  enters . . . ."[7]  Because there was no roof at the time of the storm (the pool structure had been serving as the roof for this area, but it was demolished at this point), to get around this exclusion and have this loss covered, Plaza had to show that the storm's forces damaged a roof structure and it was that damage that allowed the rain to enter.

Travelers' first adjuster to survey the damage the day after the storm thought it was covered.  In his field notes, Richard Kim noted that "the pool deck was being worked on and had a tarp over the stripped portions to the pool," but "the tarps ripped and partially blew off."[8]  He concluded that the policy "covers wind and windblown rain to building . . . with no exclusion or limitation for this loss."[9]  Travelers' second insurance adjuster also concluded that "the contractors attempted to tarp the open roof where they had removed the old pool but the storm ripped the tarp apart."[10]

Blame shifted from the storm to Breslin after Travelers' roof expert Tony Milo got involved.  He authored a report a few weeks later after reviewing "photographs, contracts, statements, [] other documentation related to the renovation project and the loss" and interviewing Breslin's project manager Kevin Owens.[11]  Milo ascertained that "tarps were installed in various locations around the pool and walls . . . secured with wood battens, metal scrap, and Jersey Barriers" but that the "terminations of the tarps appeared to be not sealed" and "portions of the pool deck roof area and walls were exposed with no waterproofing."[12]  He

---

[7] ECF No. 103-1 at 71.

[8] ECF No. 274-5 at 19.

[9] *Id.*

[10] *Id.* at 15.

[11] ECF No. 271-3 at 175.

[12] *Id.*

concluded that, while Breslin "attempted to provide temporary measures to prevent water intrusion, the means and methods taken . . . were inadequate and not consistent with industry standards."[13]  On May 25, 2016, Travelers concluded its investigation and denied Plaza's claim.[14]  Plaza[15] retained trial counsel, Weg and Myers, P.C., soon after,[16] and it filed this suit in December 2016, claiming that Travelers breached the insurance contract and the implied covenant of good faith and fair dealing in refusing to cover this loss.[17]

**C.**     **Plaza builds its case on testimony that Breslin essentially constructed a roof structure from a white hay tarp that disintegrated in the storm's wind.**

It took more than five years for this highly adversarial coverage lawsuit to get to the jury. When it finally did in March 2022, Plaza's out-of-state lead counsel, Dennis D'Antonio, Esq., of the New York law firm Weg & Myers, P.C., appearing *pro hac vice*, put on the testimony of four witnesses about the tarping of the pool hole before the storm:

- He read in the deposition testimony of **Breslin's project manager Kevin Owens**, who recounted that Breslin took certain protective measures every day, which included covering the pool with a "plastic or waterproofing membrane" and deploying "wattles" to direct the water away from areas of concern.[18]  In preparation for the storm, they used a "white farm tarp," "tied down," secured "by barricade," and "held down lots of different

---

[13] *Id.* at 176.

[14] *Id.* at 166–72.

[15] The plaintiffs are Tamares Las Vegas Properties, LLC; Plaza Hotel & Casino, LLC; and T-UPR, LLC, but I refer to them collectively as "Plaza" in this order for simplicity.

[16] Because Weg & Myers is an out-of-state firm, Plaza also retained Nevada attorney Shan Davis as local counsel.

[17] ECF No. 1 (complaint); ECF No. 91 (amended complaint).

[18] ECF No. 230 at 25:7–11.

ways."[19]  Owens further testified that that white tarp was "shredded" during the storm and thrown in the garbage: "it was thrown away.  There was nothing left."[20]  So Breslin employees replaced it with two blue tarps over the hole "right after the storm."[21]

- **Breslin superintendent Craig Pasco** took the stand and testified that he and other Breslin employees used Visqueen, tar, and tarps to prepare for the storm.  Pasco stated that Owens bought a white hay tarp specifically to cover the pool because nothing they had was large enough to secure the hole without leaving open seams.[22]

- **Phil Reed**, **Plaza's former director of engineering**, testified that, in the days leading up to the storm, he witnessed Breslin employees using a large white tarp, Visqueen, tar, tar paper, and plywood to cover holes on the roof.[23]  Reed recounted that Breslin affixed the tarp to the ground around the pool with tar, tied ropes around the edge and under the tarp to keep it taut, and set heavy, water-filled Jersey Barriers on the tarp's edges to further hold it down.[24]

- **Plaza's roofing expert, Alan Mooney**, then testified to the adequacy of Breslin's weather protections based on conditions that existed on the roof when the storm was predicted.[25]  Relying on Owens, Pasco, and Reed's representations that Breslin indeed covered the pool hole with a tarp, he opined that the measures Breslin took should have

---

[19] *Id*. at 51–52.

[20] *Id*. at 52:3–7.

[21] *Id.* at 53:4–13.

[22] *Id.* at 116:19–23.

[23] *See* ECF No. 220 at 222–227.

[24] *Id.* at 234:4–12.

[25] ECF No. 224 at 246:10-15.

6

been sufficient to protect the building below.[26]  On cross-examination, Travelers asked Mooney to assume that there was no tarp over the hole, to which Mooney responded, "That's a pretty outrageous assumption, [but] okay."[27]  Mooney testified that if there was no tarp, Breslin's actions would not have been consistent with good construction practices.[28]

**D.      The tale of the tarp drew deserved scrutiny.**

The white-hay-tarp story raised doubts, however.  Despite hundreds of photographs of the rooftop-construction progress and the precautions that Breslin took to weatherproof for the storm, there was just one picture of a white hay tarp—covering the pool five weeks before the storm.[29]  D'Antonio's extra-aggressive speaking objections each time Travelers' counsel probed that lack of corroborating photographic evidence suggested that Plaza was aware of its weakness. During Travelers' cross-examination of Pasco, D'Antonio complained that Travelers was advancing a "new" theory that there was no tarp covering the pool hole during the storm, which he construed as a fraud defense.  He insisted that any such theory should have been pled as an affirmative defense.[30]

Broaching the topic of video footage of the pool seemed to hit a nerve, too.  Travelers' trial counsel asked Plaza's roof expert Mooney on cross-examination whether he was ever given "surveillance camera footage showing the pool deck at any point in time," and Mooney

---

[26] *Id.* at 257:11–20.

[27] ECF No. 228 at 24:20–25:2.

[28] *Id.* at 25:22–26:2.

[29] *Id.* at 233:8–234:1.

[30] *Id.* at 169:15–25.

confirmed that he never saw video of the pool deck from the date of the storm.[31]   In response to this line of questioning and in the presence of the jury, D'Antonio asked for a "stipulation that there is no video or closed-circuit TV because I don't think the question should have been asked knowing that there is no such thing."[32]   At sidebar, he protested that, because Travelers asked whether Mooney saw any footage of the pool deck on the day of the storm, "he's put me in the position [in which] I now have to prove [that] there's no video" and renewed his request that the jury be instructed that "there was no video."[33]   I denied that request.[34]

**E.    Plaza counsel learns of previously undisclosed time-lapse video evidence and dismisses its case.**

As we gathered for the second week of trial, D'Antonio announced that he had "an application to make" and "a disclosure."[35]   He then revealed that, over the weekend, he and his colleagues "discovered . . . evidence that we had not been aware of that has led us to conclude that the testimony we offered . . . in the form of Craig Pasco and Kevin Owen[s] was false testimony."[36]   D'Antonio proffered that he was sent a "video" that made him conclude "that the testimony that Breslin witnesses had given in this case from the very outset" about a white tarp covering the pool was false.[37]   He then moved to dismiss Plaza's case, explaining that, without the testimony of the Breslin witnesses, Mooney's expert testimony was no longer valid, so Plaza

---

[31] *Id.* at 21:17–22:2.

[32] *Id.* at 120:7–10.

[33] *Id.* at 126:14–25.

[34] *Id.* at 127:1.

[35] ECF No. 232 at 3:7–13.

[36] *Id.* at 4:12–15.

[37] *Id.* at 5:15–20.

had "no evidence upon which the jury could find that the measure[s] that were taken were reasonable under the circumstances" and its case "collapse[d]."[38]  Travelers did not object to a dismissal with prejudice but demanded to see this smoking-gun video.[39]  D'Antonio said he didn't have it, representing that it was shown to him but he did not retain possession of it.[40]  Nevertheless, on March 22, 2022, I dismissed Plaza's case with prejudice.[41]

**F.   Post-judgment discovery develops the record on the nature of this video and who knew what when.**

Travelers moved for post-judgment discovery to compel production of the mystery video and investigate the content and source of the evidence that led Plaza to dismiss its multi-million-dollar case midtrial.[42]  At a hearing on one of Travelers' post-judgment motions, Plaza revealed that the "video" was actually a series of time-lapse images taken of the Plaza roof during the remodel, captured by non-party company Critical Focus (CF) and its employee Stephanie Watman.[43]  Plaza also revealed that some of the images had been made into a promotional video, publicly available on Plaza's YouTube channel to hype the grand opening of the new pool deck.[44]

---

[38] *Id.* at 7:9–24.

[39] *Id.* at 8:2-9, 11–18.

[40] *Id.* at 8:19–20.

[41] *Id.* at 9:17–21.

[42] ECF No. 236 (motion to compel production); ECF No. 250 (motion for leave to conduct post-trial discovery).

[43] ECF No. 249 at 16:11–14, 17:13–15.

[44] *Id.* at 18:6–18.

Plaza retained new counsel and eventually turned over the time-lapse images,[45] and I granted Travelers' motion to allow the post-judgment deposition of Stephanie Watman and Plaza employees Natashia White and Lisa Melmed, members of Plaza's marketing department who worked with Watman to produce the promotional video.[46]  I also permitted limited document discovery concerning communications and contracts between Plaza and CF; photographs, video recordings, and documents that CF sent to or received from Plaza; and documents touching on the installation or use of the camera used to capture the time-lapse images.[47]  The parties later stipulated to a three-hour deposition of Plaza's CEO Jonathan Jossel, too.[48]

### 1.    *Weg and Myers's midtrial receipt of the time-lapse footage*

Through post-judgment discovery, Travelers learned that on Sunday, March 20, 2022, Plaza's project supervisor and FRCP 30(b)(6) witness Sam Cherry forwarded Plaza's counsel an unsolicited copy of emails between CF, Melmed, and White concerning CF's use of one of Plaza's rooms overlooking the pool deck to film a time-lapse of the pool-deck renovation.[49] Those emails had originated six years earlier in March 2016 and suggested that Plaza had reserved a room in which CF could set up cameras to "take a photo every 4 minutes, which will get us to over 360 photos a day."[50]

On Monday, March 21, 2022, Weg and Myers attorney and D'Antonio's second-chair counsel, David Matulewicz-Crowley, Esq., contacted Watman, and she offered to send the time-

---

[45] *Id.* at 24.

[46] ECF No. 257.

[47] *Id.*

[48] ECF No. 262.

[49] ECF No. 274-21 at 2.

[50] ECF No. 274 at 26.

lapse images that were still in CF's possession.[51]  Matulewicz-Crowley also asked Watman for her availability to testify about the footage as a rebuttal witness.[52]  Watman didn't immediately send the video, so D'Antonio contacted Jossel and asked him to contact Watman.[53]  Jossel received the video and gave it to the Weg and Myers team to review.[54]

According to Matulewicz-Crowley, the video showed that "while there [was] evidence of some weatherproofing before the April 9 storm," there was certainly no white tarp placed over the pool hole.[55]  After watching the video several times, Plaza's counsel concluded that the case was compromised, the trial testimony of the Breslin witnesses was perjured, and Mooney's expert testimony that relied on those Breslin witnesses' accounts of the white tarp was thus infirm.[56]

Faced with this case-collapsing evidence, Plaza's counsel began researching the ethical issues they faced if they continued to prosecute it.  They reached the conclusion that "it was impossible to proceed with the litigation, that disclosure of the false testimony was required, and . . . there was no longer a good[-]faith basis to proceed against Travelers."[57]  So the following day, they jettisoned the case.[58]

---

[51] ECF No. 274-22 (text messages between Matulewicz-Crowley and Watman).

[52] *Id.* at 3.

[53] ECF No. 279–22 at 13 (45:17–23); ECF No. 274-2 at ¶ 33.

[54] ECF No. 279-22 at 13 (43:3–15), 15 (52:9–16).  Travelers filed compressed versions of the post-judgment deposition transcripts for Jossel, White, Melmed, and Watman, so four deposition pages are contained in one ECF page.  When citing to those documents I first cite the ECF pagination, and then cite the deposition pages and lines in parentheses.

[55] ECF No. 274 at 28.

[56] ECF No. 274-19; ECF No. 274-20.

[57] ECF No. 274 at 29 (citing ECF No. 274-23; ECF No. 274-24); *see also* ECF No. 274–19; ECF No. 274-20.

[58] ECF No. 232 at 4:13–15, 7:7–9, 8:12.

### 2.   *Posttrial discovery shows details of the time-lapse project plan.*

During post-judgment discovery, Plaza hired an information-technology vendor to search its servers and ultimately produced 1,520 responsive documents.[59]  That disclosure contained several emails concerning Plaza's plans to record a time-lapse of the pool renovation that were never disclosed in pretrial discovery.  They show that as early as March 22, 2016, Jossel and other Plaza employees discussed the possibility of commissioning a time-lapse.[60]  Plaza employees Melmed and White worked with CF to secure a hotel room to set up the camera that would be trained on the pool deck for the entirety of the renovation.[61]  On March 25th, Watman told them that she had finished setting up the camera.[62]  Emails concerning CF's use of the room were forwarded to Reed, Jossel, Plaza's head of security, Plaza's head housekeeper, and the hotel's managers.[63]  On March 31, 2016, Plaza held a "Pool Marketing Meeting" that included Jossel, Cherry, Melmed, White, and others, in which they discussed the time-lapse project.[64]  On April 6, 2016, Jossel emailed his team to inform them that the new pool would be installed on April 11, 2016, and specifically told White to be aware of that development "for the time-lapse."[65]

There were at least two email conversations referencing the time-lapse or CF that Plaza *did* disclose during pre-trial discovery.  Plaza produced an August 1, 2016, email between

---

[59] ECF No. 271 at 24–25.

[60] ECF No. 279-12.

[61] ECF No. 279-17.

[62] *Id.*

[63] *Id.*

[64] ECF No. 279-18 at 4.

[65] ECF No. 274-19 at 2.

Melmed, Cherry, and Breslin employee Todd McBrayer, in which Melmed tells McBrayer that Plaza is "creating a time-lapse of the entire process of the pool remodel and would like to add some captions."[66]  That document was produced first by Plaza, and then reproduced by Travelers.[67]  Plaza also produced an email chain from April 18, 2016, through May 5, 2016, in which Watman, White, Melmed, Cherry, and Pasco discuss Watman's attempts to film "b-roll" of a "cement pour" happening at the Plaza in early May 2016.[68]  One of those emails references that the pour was for the pool.[69]  And sometime between 2016 and 2019, Plaza posted the promotional video of the pool renovation—some of which was compiled from the time-lapse footage—on its public YouTube channel.  It's been there since it was posted and has been publicly available for years, but it was not disclosed in pre-trial discovery.[70]

### 3.    Post-judgment depositions test Plaza memories of the marketing project.

Travelers deposed Jossel, Melmed, White, and Watman after this case ended.  Watman explained that she co-owned CF, but it folded in 2020.[71]  She testified that the time-lapse images that CF took belonged to Plaza and if anyone from the casino had asked for the raw images, she would have provided them without hesitation.[72]  But she also said that there was no language in the various project proposals that were circulated between Plaza and CF delineating who owned

---

[66] ECF No. 271-3 at 6.

[67] *See id.* at 9 (same document, showing several Bates stamps from separate productions).

[68] ECF No. 274-4 at 107–48.

[69] *Id.* at 147.

[70] *See* "Pool at the Plaza Construction Time-Lapse," http://youtube.com/watch?v=cUG3oS4-YaA (last visited September 12, 2023).

[71] ECF No. 279-11 at 7 (15:22–25).

[72] *Id.* at 12 (34:4–9).

the raw footage.[73]  She further explained that her company was being paid to provide Plaza with three edited promotional videos, not the raw time-lapse footage, so she didn't provide that footage automatically.[74]  Watman explained that she was contacted by Weg and Myers in March 2022, and that was the first time anyone connected with Plaza asked CF for any footage.[75]

Melmed testified that Jossel came up with the idea to commission a time-lapse as part of a video to promote Plaza's renovations.[76]  She noted that Plaza received the final, edited promotional video from CF in August 2016.[77]  White testified that Jossel approved the budget for the promotional video.[78]  White further testified that she and Melmed were asked to search their inboxes for emails related to the pool, but that "[a]t the time, we really didn't understand what we were collecting information on."[79]  White also noted that, between 2016 and 2022, no one asked her to contact CF and see if they had additional time-lapse images.[80]

Jossel testified that while he used the word "time-lapse" in various 2016 emails discussing the project, he only understood that CF would be making a promotional video and didn't read emails that he was cc'd on—like those discussing CF's request for a guest room above the pool deck to set up cameras.[81]  Jossel said that he had no recollection that a room was

---

[73] *Id.* at 35 (127:1–4).

[74] *Id.* at 34 (125:6–9).

[75] *Id.* at 10, 29 (105:18–25).

[76] ECF No. 279-13 at 11 (30:12–16).

[77] *Id.* at 23 (81:14–23).

[78] ECF No. 279-14 at 7 (14:15–15:2).

[79] *Id.* at 15 (46:1–7).

[80] *Id.* at 15 (47:5–8).

[81] *See generally* ECF No. 279-22 at 8, 22.

1  being used for that purpose and didn't grasp that CF's work would involve automatically

2  capturing images of the pool deck throughout the remodel.[82]

3  ### *4.    What the time-lapse video reveals about the tarp story*

4  In conjunction with this motion, the parties filed several versions of the time-lapse

5  images, compressed into short videos, for the court's review.[83]  It appears that two cameras with

6  slightly different perspectives captured the pool-deck area.  None of the videos shows a white

7  hay tarp over the pool in preparation for the storm.  The cameras did catch employees spreading

8  two blue tarps over the hole and securing them with Jersey barriers.  The images also show

9  workers applying Visqueen over the edges of the tarps and in other areas near the pool.  But

10  because the time-stamp data on the footage is corrupted, it's impossible to pinpoint precisely

11  when those precautions were taken.

12  ### Discussion

13  Travelers theorizes that the existence of the time-lapse images shows that Plaza lacked a

14  reasonable basis for this suit and that Plaza, its counsel, or both knew or had reason to know that

15  the video existed long ago and intentionally withheld it from discovery.[84]  So Travelers moves

16  for an order directing Plaza to reimburse it for the more than two million dollars in attorneys'

17  fees and litigation costs that it incurred to defend against this bogus coverage suit.  The

18  American Rule recognizes that litigants must bear their own attorneys' fees unless a rule, statute,

19  or contract authorizes the court to shift that burden.[85]  Travelers argues that five separate statutes

20

---

21  [82] *Id.* at 24 (86:7–13).  Travelers did not re-depose Reed, who was also cc'd on at least one email
     about the time-lapse project.

22  [83] Plaza also produced all of the still images.  ECF No. 271-5–271-17.

23  [84] ECF No. 265.  Travelers' exhibits are filed on the docket at ECF No. 279.

[85] *MRO Commc'n Inc. v. Tel. & Co.*, 197 F.3d 1276, 1281 (9th Cir. 1999).

or court rules provide that authority here: (1) Nevada Revised Statute (NRS) 18.010(2)(b), which authorizes fees against a party who brings a suit without reasonable ground; (2) NRS 7.085, which permits fees against counsel for bringing a suit in bad faith (3) Federal Rule of Civil Procedure (FRCP) 37(c) for Plaza's failure to produce the footage in its initial disclosures or in response to discovery requests and for submitting untrue admissions; (4) the court's inherent power to assess fees for bad-faith conduct; and (5) 28 U.S.C. § 1927, which allows an award of fees against an attorney who "so multiplies the proceedings in any case unreasonably and vexatiously."[86]   Although it turned out that Plaza's case against Travelers was built on a lie, the record does not support an award under any of these provisions.

**A.    Travelers cannot collect attorneys' fees under NRS 18.010 or NRS 7.085.**

NRS 18.010(2) permits the recovery of attorneys' fees to a prevailing party "when the court finds that the claim . . . of the opposing party was brought or maintained without reasonable ground or to harass the prevailing party."[87]   NRS 7.085 requires courts to shift the burden of attorneys' fees to opposing counsel who has "filed, maintained[,] or defended a civil action or proceeding . . . [that is not] well-grounded in fact or is not warranted by existing law or by an argument for changing the existing law that is made in good faith" or has "unreasonably and vexatiously extended a civil action or proceeding."[88]   Both statutes also instruct courts to "liberally construe" them "in favor of awarding attorney[s'] fees in all appropriate situations" with the goal of deterring "frivolous or vexatious claims and defenses [that] overburden limited

---

[86] Plaza and its trial lawyers filed separate responses, and Travelers replied to both.  ECF No. 271 (Plaza's response); ECF No. 275 (Travelers' reply to Plaza); ECF No. 274 (Plaza's counsel's response); ECF No. 276 (Travelers' reply to Plaza's counsel).  I entertained oral argument on Travelers' motion this summer.  ECF No. 286; ECF No. 287 (hearing transcript).

[87] Nev. Rev. Stat. § 18.010(2).

[88] Nev. Rev. Stat. § 7.085(1).

judicial resources, hinder the timely resolution of meritorious claims[,] and increase the costs of engaging in business and providing professional services to the public."[89]

Plaza and its counsel dispute that these Nevada state statutes apply to this suit that found its way to federal court based on diversity jurisdiction. They contend that Travelers seeks to sanction litigation conduct, which is governed by federal procedural rules, not state substantive law.[90] Travelers replies that, because it only targets conduct *before* bringing the suit under these statutes—i.e., Plaza's failure to find the footage in pre-suit investigations—Nevada substantive law applies.[91] The Ninth Circuit and courts in this district are split on whether to apply state law in these circumstances.[92] But I need not answer this *Erie* question and decide whether the

---

[89] Nev. Rev. Stat. § 18.010(2)(b); Nev. Rev. Stat. § 7.085(2).

[90] ECF No. 271 at 28; ECF No. 274 at 34; *see also In re Larry's Apartment, LLC*, 249 F.3d 832 (9th Cir. 2001) (explaining that federal law applies to requests for sanctions to punish fraud perpetrated on the court or bad-faith conduct during litigation). Because Travelers limits its argument under these state statutes to pre-suit conduct, I assume without deciding that NRS 18.010(2)(b) applies, and I only determine whether Plaza or its counsel had a reasonable basis to bring this suit, not whether their conduct during litigation was performed in bad faith.

[91] ECF No. 275 at 5–6.

[92] *Compare, e.g., Heyman v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 2020 WL 428013, at *4–5 (D. Nev. Jan. 27, 2020) (finding that NRS 18.010(2)(b) doesn't apply to procedural argument that the plaintiff "knew he had no claims against" the defendant, but brought them anyway), *Taylor v. Beckett*, 2017 WL 3367091, at *3 (D. Nev. Aug. 4, 2017) (declining to apply NRS 18.010 when party seeking fees argued that its opponent frivolously brought and maintained the lawsuit), *In re Andrade-Garcia*, 635 B.R. 509, 515 (B.A.P. 9th Cir. 2022) (rejecting argument that NRS 18.010(2)(b) "was implicated at the time the claims were filed" and thus should be treated as substantive law, explaining that "filing a proof of claim is 'conduct' in the bankruptcy court" and thus governed by federal law), *and Oliva v. Nat'l City Mortg. Co.*, 490 F. App'x 904, 906 (9th Cir. 2012) (unpublished), *with, e.g., Equals Int'l, LTD. v. Scenic Airlines*, 35 F. App'x 532, 534–35 (9th Cir. 2002) (unpublished) (upholding an award of fees under NRS 18.010(2)(b) for a state-law action brought in federal court) *and Topolewski Am., Inc. v. Cal. Employment Development Dep't*, 2023 WL 2756528, at *6 (D. Nev. Mar. 31, 2023) (applying NRS 18.010(2)(b) to analyze argument that state-law claim was frivolously brought).

statutes apply here because, even if they did, Travelers has not shown that it is entitled to fees under either provision on this record.

### 1.     Travelers has not shown that Plaza lacked a reasonable basis for filing and maintaining this lawsuit.

"For purposes of NRS 18.010(2)(b), a claim is frivolous or groundless if there is no credible evidence to support it."[93]  "Determining whether attorney fees should be awarded under [the statute] requires the court to inquire into the actual circumstances of the case, rather than a hypothetical set of facts favoring plaintiff's averments."[94]  Travelers contends that Plaza failed "to conduct earnest research or undertake a reasonable and competent inquiry into the facts before filing [this] lawsuit."[95]  It argues that Plaza didn't "reasonably investigate[] whether Breslin covered the pool opening" because it didn't call Watman and retrieve the time-lapse footage that Jossel and his management team discussed just two weeks before the storm.[96]  Trusting Breslin's account of its weatherproofing efforts, according to Travelers, was unreasonable in light of the availability of direct evidence contradicting Breslin's representations.  It further notes that Plaza threatened to sue Breslin for the rain damage, "giving Breslin employees a powerful incentive to lie."[97]

Viewing the totality of circumstances as they existed in 2016 when this case was filed, I cannot conclude that the suit then appeared frivolous or groundless.  As Plaza argues, its reliance on Breslin's tarp story was reasonable given that Breslin employees were communicating about

---

[93] *Rodriguez v. Primadonna Co.*, 216 P.3d 793, 800 (Nev. 2009) (citations omitted).

[94] *Baldonado v. Wynn Las Vegas, LLC*, 194 P.3d 96, 106–07 (Nev. 2008) (cleaned up).

[95] ECF No. 265 at 24.

[96] *Id.* at 25.

[97] *Id.*

weatherproofing efforts in the days immediately preceding the storm,[98] and none of the Breslin-Plaza communications in the record gave Plaza reason to believe that Breslin was lying.  Indeed, photos of rooftop deck show blue tarps in or on the pool at some point on the day of the storm.[99] So the lie wasn't immediately obvious such that Plaza or its lawyers were on inquiry notice of it.

Further evidence that the tarp tale seemed solid is the fact that "*everyone* relied on Breslin's accounts of what happened"—including Travelers.[100]  The first adjuster that Travelers sent to the site wrote in his field notes that "the pool deck was being worked on and had a tarp over the stripped portions to the pool," but "the tarps ripped and partially blew off."[101] Travelers' second adjuster similarly reported that "the contractors attempted to tarp the open roof where they had removed the old pool but the storm ripped the tarp apart."[102]  Even Travelers' roof expert concluded after his investigation that "tarps were installed in various locations around the pool and walls . . . secured with wood battens, metal scrap, and Jersey Barriers."[103] And when Travelers moved for summary judgment in 2018, it listed as an undisputed fact that "[a]s of April 8, 2016, workers attempted to cover the large opening in the roof with a hay tarp."[104]  Although Travelers' cross-examination strategy at trial suggested that the insurer thought that fact might be fiction, it seems that suspicion didn't arise until trial prep.

---

[98] *See* ECF No. 230 at 113:4–5 (Dan Weatherbie email); 114:6–7 ((Pasco email stating "redid areas of concern.  Nothing moving.  Going to be a good night.").

[99] *See* ECF No. 224 at 182–183 (eliciting testimony about a photograph, taken at 9:43 P.M. on April 9, 2016, showing two blue tarps covering the pool).

[100] ECF No. 271 at 30.

[101] ECF No. 274-5 at 19.

[102] *Id*. at 15.

[103] ECF No. 271-3 at 175–76.

[104] ECF No. 101 at 8.

Travelers' contention that Plaza could have verified Breslin's account simply by placing a call to CF can be supported only by hindsight.  While Watman testified at her post-dismissal deposition that she would have immediately produced the raw time-lapse footage had she been asked,[105] no Plaza employee testified that they had that understanding.  Jossel, White, and Melmed all maintained that they did not know that CF had raw footage that wasn't in the final promotional video or that they could ask for it.[106]  And while Watman testified that CF contracts usually contained language stating that all footage belongs to the client,[107] no such contract was produced here.

Email correspondence near the time of the storm shows that Jossel was made aware that CF was taking photos of the work, suggesting that he should have sought them out after the storm and during discovery.  But Jossel testified that he was unaware of the extent of the project and didn't know photographs were being constantly taken on the day of the storm.[108] Importantly, Jossel wasn't the only one to miss that opportunity.  Travelers got those emails in discovery and its lawyers, too, failed to pick up on any signal of relevant photos.  So the record does not support the inference that anyone at Plaza knew that CF images of the pool during the storm existed, much less that those images might be detrimental to this case.[109]

---

[105] ECF No. 279-11 at 12 (34:4–9).

[106] ECF No. 279-22 at 25 (92:16–21), 36 (134:14–18); ECF No. 279-14 at 14 (42:20–44:24); ECF No. 279-13 at 25 (86:20–24).

[107] ECF No. 279-11 at 12 (34:12–20), 35 (127:1–4).

[108] ECF No. 279-22 at 24 (86:7–13).

[109] *See Stubbs v. Strickland*, 297 P.3d 326, 331 (Nev. 2013) (upholding denial of sanctions motion under NRS 18.010(2) and NRS 7.085 because "nothing in the record demonstrates [that the plaintiff] made accusations [that] he knew were untrue").

Even if those time-lapse images were readily available and at the front of the Plaza representatives' minds, I cannot say for certain that this evidence would have shaken their faith in this lawsuit.  The significance of the time-lapse footage isn't as clear as Travelers makes it out to be.  The first video that was filed with the court has no time stamps, so it cannot be determined when the images were shot.[110]  The second and third are dated, but with inaccurate time stamps.  One erroneously dates the video as April 2014.  The other is overlayed with dates in April 2016, but the timestamps are clearly wrong as they show sunny weather at 2:47 A.M. and the dark of night at 6:37 A.M.[111]  Because of the missing or inaccurate time stamps, it's unclear from any of the videos if the tarps and other precautions were placed before, during, or after the storm.

Moreover, I cannot, with any certainty, conclude from this evidence that *no* protections like the ones Breslin and Plaza described existed over the pool hole when the bulk of the rain fell and flooded the casino.  Travelers points to the fact that the pool deck was visibly wet and then dried a couple of times before Breslin put the blue tarps over the pool, arguing that the moisture indisputably shows that no precautions were in place during the storm.  But, as Plaza's posttrial counsel pointed out at oral argument, it rained on April 8th and in the morning of April 9th before the deluge hit.[112]  So it's entirely possible from the time-lapse evidence that Breslin realized the storm was going to be bigger than expected on the evening of April 8th or the morning of April 9th and added protective measures after it drizzled, but before it poured.  If that's the case, the existence of those waterproofing measures—Visqueen, tar, and two blue

---

[110] ECF No. 255 (notice of manual filing).

[111] ECF No. 273 (notice of manual filing).

[112] ECF No. 287 at 34:5–22, 35:9–16.

tarps—may have given Plaza one more reason to believe that Breslin constructed an adequate temporary roof that would qualify for insurance coverage.

None of these bases is undermined by the fact that Plaza obtained a reservation of rights to permit it to later bring a lawsuit against Breslin for the damage. Such a strategy is a common practice in construction-related litigation, and it does not support an inference that this Sword of Damocles so compromised Breslin's fidelity that the Plaza needed to doubt its white-tarp story. So I find that there was credible evidence to support Plaza's decision to litigate this insurance-coverage case, and the existence of the time-lapse images in CF's possession did not rob Plaza of its objectively reasonable basis for bringing suit.

### 2. *Plaza's counsel had a well-grounded factual basis for bringing this suit.*

"An award of fees under" NRS 7.085, which authorizes an award of litigation fees and costs against an attorney who files or maintains a frivolous suit, "requires fact-intensive analysis."[113] In seeking an award against Plaza's trial counsel, Travelers contends that Plaza's counsel undertook very little investigation before filing this suit.[114] It accuses counsel of "interview[ing] some fact witnesses, and [reviewing] a modest collection of documents . . . concerning the loss," arguing that such an investigation is plainly inadequate.[115] And Travelers claims that Plaza's lawyers "relied exclusively on what they figured Breslin employees would say under oath," a decision that it maintains was "particularly reckless" because counsel "never actually spoke directly with the employees."[116]

---

[113] *Washington v. AA Primo Builders, LLC*, 440 P.3d 49, at *2 (Nev. 2019) (unpublished table disposition) (citing *Watson Rounds, P.C. v. Eighth Jud. Dist. Ct.*, 358 P.3d 228, 233–34 (Nev. 2015)).

[114] ECF No. 265 at 26–27.

[115] *Id*. at 26.

[116] *Id.* at 26–27.

Travelers grossly understates Plaza's counsel's presuit efforts.  Two declarations set out all of the steps that Plaza's attorneys took to investigate Travelers' denial of Plaza's insurance claim.[117]  In his declaration, Joshua Mallin, Esq. explains that Weg and Myers was retained by Plaza in June 20, 2016, after Travelers denied the claim.  D'Antonio, for his part, avers that he and his team immediately "review[ed] and analyz[ed] documents, including photographs, construction contracts, post-loss engineering reports, pre-loss engineering reports, [and] weather data; investigat[ed] the credentials of Travelers' expert (Milo), [conducted] legal research related to the claim denial about what constitutes a roof under Nevada law, [had] conversations with the insureds' public adjuster and the insurance brokers who had placed the policy, and [met with] witnesses."[118]

The record further reflects that, in July 2016, counsel interviewed Plaza's Phil Reed, Sam Cherry, and Jonathan Jossel twice—once telephonically and again in person.[119]  They tried to interview Breslin witnesses, but Breslin's counsel "declined [their] requests" and instead provided "an indication of what the Breslin employees would testify to."[120]  Plaza notes that Travelers' claims adjusters did interview Breslin employees and didn't receive any information contrary to what Plaza's counsel learned during their pre-suit investigation.[121]  Counsel did not focus on the existence of a tarp covering the roof because they "assumed, as did Travelers, based on the facts and reports, that Breslin told the truth and that a tarp was installed before the

---

[117] ECF No. 274-3 (Mallin's declaration); ECF No. 274-2 (D'Antonio's declaration).

[118] ECF No. 274-2 at ¶ 7.

[119] *Id.* at ¶¶ 8–11.

[120] *Id.* at ¶ 13.

[121] ECF No. 271 at 30.

storm."[122]  At no point did they receive information that contradicted Milo's report or the facts as presented in the denial letter.[123]  And counsel declared that they became aware of the promotional video posted on YouTube post-summary judgment but believed it to be irrelevant since it appeared to relate to the pool's grand opening that occurred months after the storm.[124]  They were not alerted to the existence of the raw time-lapse footage until the middle of trial on March 21, 2022.[125]

On this record, I cannot conclude that Plaza's trial lawyers knew or should have known that this lawsuit was not well-grounded in fact when it was filed.  Plaza's counsel interviewed relevant witnesses, reviewed documents that are typically crucial to an insurance dispute, and received the information they needed from counsel for third-party Breslin.  And when the early accounts of Breslin's storm preparation were so consistent and widely adopted,[126] counsel had no reason to seek out evidence to undermine them.  So if NRS 7.085 applies to counsel's actions here, sanctions under that statute are not warranted.

---

[122] ECF No. 274-2 at ¶ 6.

[123] *Id.* at ¶ 14.

[124] *Id.* at ¶ 16.

[125] *Id.* at ¶ 28–30.

[126] *See supra* at pp. 4, 19.

**B.      The rules of discovery do not entitle Travelers to an award of attorneys' fees.**[127]

The discovery period in this case ran for 471 days—from February 6, 2017, through May 23, 2018.[128]  Plaza served initial disclosures and supplemented them six times.[129]  Of course, none of those disclosures included the time-lapse images, the promotional video, or emails referring to them.[130]  Nor did they list Melmed, White, Watman, or CF as potential witnesses.[131]  But Plaza produced all of the photos that Jossel collected after the storm and any others that it had direct access to.[132]  Travelers served several discovery requests, including requests for admissions (RFAs)[133] and three sets of requests for the production of documents (RFPs).[134]  At no time during this extended discovery period did the parties agree to any particular protocol for the collection of electronically stored information (ESI).[135]

FRCP 37(c) allows the court to award sanctions for a party's failure to "provide information or identify a witness as required by Rule 26(a) or (e)."  The primary sanction for that failure is to prohibit the offending party from using that information "to supply evidence on a

---

[127] Travelers initially requested discovery sanctions against Plaza *and* its counsel.  Counsel argued in its response brief that FRCP 37 does not apply to counsel in situations like these.  ECF No. 274 at 36–38.  In its reply, Travelers did not respond to that argument and did not press the imposition of Rule 37 sanctions on Plaza's counsel.  *See* ECF No. 276.  So I consider that argument waived and proceed to analyze only whether discovery sanctions are warranted against Plaza.

[128] ECF No. 64.

[129] *See* ECF No. 271-3 at 200–225; ECF No. 271-4 at 5–45.

[130] *See id.*

[131] *See id.*

[132] *Id.*

[133] ECF No. 236-4.

[134] ECF No. 271-4 at 47–70; ECF No. 275-2.

[135] ECF No. 271 at 15.

1 motion, at a hearing, or at trial."[136]  But courts may also sanction the offending party by ordering

2 "payment of the reasonable expenses, including attorney's fees, caused by the failure" and any

3 other "appropriate sanctions."[137]  The Ninth Circuit "gives particularly wide latitude to the

4 district court's discretion to issue sanctions under FRCP 37(c)(1) because subsection 37(c)(1) is

5 a recognized broadening of the sanctioning power."[138]  Travelers contends that sanctions should

6 be imposed under Rule 37 because Plaza's belated dismissal was caused by its: (1) failure to

7 produce the footage in its initial or supplemental disclosures, (2) failure to produce the footage in

8 response to Travelers' discovery requests, and (3) denial of requests for admissions that the time-

9 lapse proves were true.[139]

### 1.    Travelers has not established that Plaza was required to include the time-lapse images in its Rule 26 disclosures.

12 Travelers contends that Plaza was required to disclose the time-lapse footage and its

13 creators as documents and witnesses "relevant to [Plaza's] claims."[140]  But Travelers overstates

14 the initial-disclosure obligation.  FRCP 26(a)(1)(A)(ii) requires a party to disclose any

15 documents and tangible things "in its possession, custody, or control" that the party "may use to

16 support its claims or defenses, unless the use would be solely for impeachment" without awaiting

17 a discovery request for those items.[141]  Subsection (e) of that rule requires a party to supplement

---

[136] Fed. R. Civ. P. 37(c)(1).

[137] Fed. R. Civ. P. 37(c)(1)(A), (C).

[138] *R & R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1245 (9th Cir. 2012) (internal quotations omitted).

[139] ECF No. 265 at 28–37.

[140] *Id.* at 29.

[141] Fed. R. Civ. P. 26(a)(1)(A)(ii).

or correct its initial disclosures if it learns that the disclosure was incomplete or incorrect.[142] Neither rule requires a party to disclose any and all evidence that may be *relevant* to its claims; Rule 26(a) only compels the disclosure of evidence that a party *may use* to support its claims.[143] Even if I assumed that Plaza and its counsel knew about the footage, Plaza would not have been obligated to produce it in initial disclosures if it didn't intend to use it.  So Travelers' indignation over Plaza's failure to comply with Rule 26(a)'s initial-disclosure requirements is unmerited.

### 2.   *Travelers has not shown that the time-lapse footage would have been responsive to its discovery requests.*

Travelers next contends that several of its discovery requests "should have prompted [Plaza] to produce" the time-lapse images.[144]  It points to numerous discovery requests that it claims unequivocally encompassed, or should have prompted the disclosure of, the time-lapse footage.

The first of these requests sought the admissions that "as of April 9, 2016, portions of the building's metal roof deck were exposed" and that "Breslin's attempt[s] to install temporary

---

[142] Fed. R. Civ. P. 26(e)(1)(A).

[143] *See R & R Sails*, 673 F.3d at 1246 (noting that a party had no affirmative obligation to disclose information not covered by Rule 26(a) absent a request from its adversary).

[144] ECF No. 265 at 32.  Travelers mixes its argument about the failure to respond to discovery requests with its contention that Plaza violated its initial-disclosure obligations.  FRCP 37(c)(1) applies only to violations of Rule 26(a) and (e), which do not apply to responses to discovery requests.  In those instances, the typical course of action is to move to compel discovery and then seek sanctions if the offending party doesn't comply with a court order to produce certain discovery.  *See* Fed. R. Civ. P. 37(a), (b).  But this is an unusual circumstance, as Travelers' requests don't obviously encompass the time-lapse footage, but all parties concede, at one point or another, that it should have been produced.  *See* ECF No. 240 at 5–6 (Plaza's response to Travelers' post-judgment motion to compel, claiming that "there is no dispute that Travelers sought production of any video in [Plaza's] possession"); ECF No. 274-2 at ¶ 23–24 (D'Antonio's declaration).  Because I ultimately find that, even if FRCP 37 (either subsection (b) or (c)) does apply to Plaza's nondisclosure, Travelers is not entitled to sanctions, I don't nitpick this procedural point.

waterproofing measures . . . were not consistent with industry standards."[145]  Travelers served

accompanying RFPs for "all documents referenced or relied on in making, or which you contend

supports" the denial of those RFAs.[146]  But Plaza did not reference or rely on the time-lapse

images when denying the admissions because it didn't then have access to those images.

Travelers has not shown that the responsive nature of the footage was known to Plaza when

those admissions were answered.  So I cannot find that Plaza's failure to rely on those images in

responding to the RFAs and not producing the images in response to Travelers' RFPs was

sanctionable.

The second request that Travelers points to arose at the end of Jossel's first deposition,

when Plaza's counsel promised to ensure they'd turned over all photos and videos in Jossel's

possession:

> Travelers' counsel: We talked earlier about photos that you'd taken
> of the pool renovation project on your cellphone.  Is that the same
> cellphone that you have now?
>
> Jossel: I think so.  Yes.
>
> Travelers' counsel: Would you be agreeable to just making sure
> that whatever photos you took of the pool project at any time
> during that, just work with counsel and make sure those photos
> have been produced if they haven't already.
>
> Plaza's counsel: No, no, no.  Look, as a matter of fact, I want to
> make sure that that's the case, so I think the easiest way—if you
> don't mind—rather than me comparing what I have and what has
> been produced, why don't you just make a new dump of all photos
> that you have.  And then, I'll just forward that to you en masse.
>
> Jossel: You're talking about the pictures I may have taken in
> February and March?
> …

---

[145] ECF No. 236 at 4.

[146] *Id.* at 5.

Travelers' counsel: No.  From the start of the project to the end of the project.

…

Plaza's counsel: I would say, just let's make sure that we don't have anything that's missing.  So you can dump everything.  He's entitled to anything you have there. . . .  So instead of us trying to figure out what was produced and what wasn't produced, which would be more labor intensive and I'd have my lawyers going through it, let's just resend it all. . . . This way, there's no doubt that he's got everything, and that includes videos and anything.  We'll do that.

Travelers' counsel: Thank you.[147]

Travelers contends that this exchange was a formal request for all photos and videos from the start to the end of the pool renovation—which would have encompassed the CF footage.  But it clearly wasn't.  Travelers' counsel asked for all photos that Jossel took of the pool deck.  Jossel didn't take the time-lapse photos—indeed, he maintained at his posttrial deposition that he was unaware that those photos even existed.  That deposition conversation—and defense counsel's request for pictures from Jossel's cellphone—cannot be reasonably construed as having placed counsel or Jossel on notice that they should be searching for time-lapse pictures in the hands of a third-party company.[148]

Third, Travelers points to its May 2018 request for "any video footage or images from April 2016 from the security/surveillance cameras on the rooftop deck."[149]  Plaza's counsel

---

[147] ECF No. 274-17 at 9–11.

[148] At oral argument, Travelers' counsel focused on D'Antonio's declaration, prepared in response to Travelers' motion, in which he states that he interpreted the request at Jossel's deposition as one asking for "all photos of the pool project."  ECF No. 287 at 20:12–25 (citing ECF No. 274-2 at ¶ 23).  As the factfinder, I credit the statements as they were actually made over counsel's representations or understandings.  But even if I accepted that D'Antonio understood the request to be for all photos in Plaza's possession, my analysis does not change.  The record reflects that Plaza's counsel repeatedly asked for all photos and videos in Plaza's possession, and Plaza believed it complied.

[149] ECF No. 236 at 8–9 (Travelers' motion to compel post-judgment discovery).

1  responded that they previously searched for security footage, it didn't exist, but they would look

2  again.[150]  This request would have prompted Plaza to look for surveillance footage—and it

3  seems as though it twice conducted that search—but not for camera footage belonging to a third-

4  party company hired to make a promotional video.  Travelers next points generally to its third

5  RFP, stating that it contained "specific[] request[s] [for] photographs of the pool renovation."[151]

6  But those requests specifically asked for photographs taken by Phil Reed and Sam Cherry—

7  neither of whom was responsible for the time-lapse project.[152]  Travelers then notes various

8  generic statements and arguments by Plaza's counsel that show that counsel may have believed

9  they were obligated to turn over all photo and video evidence of the pool renovation they had in

10  their possession.[153]  But Plaza counsel's consistent position that it would disclose any videos and

11  photos in their client's possession, regardless of the fact that Travelers never specifically asked

12  for it, cuts against a finding of sanctionable conduct here.

13        Travelers next contends that it requested several admissions "designed to identify the pre-

14  storm protective measures that [Plaza] and Breslin had installed, as well as the overall condition

15  of the roof deck and pool hole in advance of the storm."[154]  In response to those requests, Plaza

16  "denied that on April 9, 2016, portions of the Casino's metal roof decking were exposed, denied

17  that Breslin's efforts to install temporary waterproofing measures did not comport with industry

18

---

19  [150] *Id.* at 9.

20  [151] ECF No. 275 at 7 n.6.

    [152] *See* ECF No. 275-2.

21  [153] *See* ECF No. 265 at 32 (citing ECF No. 240 at 5–6, in which Plaza represented that "[t]here is
    no dispute that Travelers sought the production of any video in [Plaza's] possession"); ECF No.

22  ECF No. 287 at 20:12–25 (citing ECF No. 274-2 at ¶ 23) (defense counsel's contention at oral
    argument that D'Antonio's declaration, prepared in response to Travelers' motion, states that he

23  interpreted the request at Jossel's deposition as one asking for "all photos of the pool project").

    [154] ECF No. 265 at 35.

standards; and denied that [Plaza or] Breslin failed to properly waterproof the open area of the roof before the subject rainstorm."[155]  Travelers argues that those denials were false, so this court should sanction Plaza under FRCP 37(c)(2), which permits an award of reasonable expenses, including attorney's fees, "[i]f a party fails to admit what is requested under Rule 36 and if the requesting party later proves . . . the matter true."  The court must award fees unless "the request was held objectionable under Rule 36(a), the admission was of no substantial importance, the party failing to admit had a reasonable ground to believe that it might prevail on the matter, or there was other good reason for the failure to admit."[156]  "[T]he true test under Rule 37(c) is not whether a party prevailed but whether he acted reasonably in believing that he might prevail."[157]

An award under Rule 37(c)(2) is unavailable for the same reasons that such sanctions are unwarranted under NRS 18.010 and 7.085.  Breslin's early accounts of its tarping efforts, everyone's reliance on it, and all the evidence gathered pre-trial gave Plaza a reasonable basis to deny Travelers' requests for admission.  And posttrial discovery failed to reveal that Plaza or its counsel knew during discovery that the footage existed, intentionally or recklessly failed to obtain it, or had any true reason to doubt the veracity of Breslin's word.  So Plaza had a reasonable basis for its failure to admit.

In sum, Travelers has been unable to identify any discovery request it proffered that Plaza failed to adequately respond to, and it appears that both sides share the blame for the failures that led to this costly snafu.  While it didn't occur to Plaza employees that the third-party vendor making their grand-reopening promotional video might have storm or pre-storm images relevant

---

[155] *Id.*

[156] Fed. R. Civ. P. 27(c)(2)(A)–(D) (cleaned up).

[157] *Marchand v. Mercy Med. Ctr.*, 22 F.3d 933, 937 (9th Cir. 1994).

to this lawsuit, Travelers also didn't ask for all videos and photographs in Plaza's control or seek

any confirmation that no third-party company held relevant discovery.  Neither party agreed to

an ESI protocol during discovery that might have stumbled upon the emails discussing the scope

of the time-lapse project and CF's involvement.  And surely Plaza could have done more to

ensure that all relevant photos and videos were captured in their discovery searches.  But on this

record, I cannot conclude that Plaza violated any discovery rules that would warrant sanctions

under FRCP 37.

**C.    Travelers hasn't shown bad faith to justify this court's exercise of its inherent power to impose sanctions.**

The court's inherent power to assess sanctions against parties and their counsel for bad-

faith conduct[158] is an additional exception to the American Rule, and the Ninth Circuit and

Supreme Court have found it applicable "when a party acts for an improper purpose" or if there's

a "willful abuse of judicial processes."[159]  The inherent power to sanction "must be exercised

with restraint and discretion."[160]  "Mere recklessness, without more, does not justify sanctions

under a court's inherent power."[161]  Instead "the court must make an explicit finding that the

---

[158] *See, e.g., Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) (finding that "an assessment of attorney's fees is undoubtedly within a court's inherent power"); *Roadway Express*, 447 U.S. at 765 (noting that "[t]he power of the court over members of its bar is at least as great as its authority over litigants," and finding that, "[i]f a court may tax counsel fees against a party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse the judicial process"); *Matter of Beverly Hills Bancorp*, 752 F.2d 1334, 1340 (9th Cir. 1984) (noting that § 1927 remedies "exist along with a court's inherent power to award fees under equity whenever justice requires").

[159] *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (citing *In re Itel Sec. Litig.*, 791 F.2d 672, 675 (9th Cir. 1986), and *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980)).

[160] *Chambers*, 501 U.S. at 44.

[161] *Id.* at 993–94.

sanctioned party's conduct 'constituted or was tantamount to bad faith,'"[162] which "requires proof of bad intent or improper purpose."[163]

Travelers argues that, if nothing else, this court should exercise its inherent sanction power because Plaza and its "litigation counsel acted recklessly—if not willfully—by commencing this action and by prosecuting it for nearly six years when visual evidence undermining a cause of action against Travelers was within [Plaza's] control since April 2016."[164]  It contends that bad faith is evident because (1) Jossel and other team members were included on emails days before the storm that discussed the time-lapse project, but no one ever asked for that footage once litigation began; (2) Plaza's counsel "never bothered to ask, or Jossel and his team did not tell them, who might have photographs or video recordings depicting the pool deck as it appeared in the hours and days before the storm"; and (3) counsel didn't seek any additional footage after they learned of the promotional video to celebrate the pool's opening.[165] At oral argument, Travelers acknowledged that, to conclude that Plaza's failure to find or disclose the video was intentional rather than negligent, the court would have to draw that inference from the totality of the evidence in the record.[166]

Despite this voluminous record, however, I cannot draw that inference.  For sure, Plaza and its counsel's investigation into available video and photographic evidence could have been more thorough, and the specious absence of photos placing the white tarp on the roof deck

---

[162] *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1090 (9th Cir. 2021) (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648–50 (9th Cir. 1997)).

[163] *Id.*

[164] ECF No. 265 at 38.

[165] *Id.* at 37–38.

[166] ECF No. 287 at 13:12–25, 14:1–3.

during the storm should have raised red flags.  But nothing indicates that Plaza or its counsel knew or had reason to believe—any more than Travelers' counsel did—that the time-lapse footage existed; that CF still had access to it; or, if obtained, it would show that the white-tarp story that formed the whole basis for Plaza's coverage claims was pure fiction.  Nor can I find bad faith from counsel's decision not to disclose the promotional video after learning of it post-summary judgment.[167]  That video was publicly available and is the first video result that appears when one Google searches "Plaza pool renovation."  While the best practice would have been to disclose the video as soon as counsel discovered it, I cannot conclude that Plaza or counsel intentionally withheld it in bad faith, as Travelers could have found it at any time, and its significance to this case comes from the raw footage left on the cutting-room floor, not necessarily the promotional video itself.[168]

Although the cases in which bad-faith-sanctions have been imposed are particularly fact-specific, key decisions from the Ninth Circuit and the Supreme Court show that the conduct here falls short of the bad-faith mark.  In *Chambers v. NASCO*, the High Court agreed that bad-faith sanctions were merited against a litigant and his attorney who engaged in a pattern of concerted efforts to frustrate the outcome of litigation—including creating trusts, recording deeds, concealing those acts from the court, and filing "a series of meritless motions and pleadings" despite repeated court warnings.[169]  In *Gomez v. Vernon*, the Ninth Circuit found bad faith where counsel for the defendant read, reviewed, and knowingly failed to disclose access to the

---

[167] *See* ECF No. 274-2 at ¶ 16 (D'Antonio's declaration that he learned of the promotional video post-summary judgment and believed it was "immaterial" and "not relevant").

[168] *See Diaz v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1035 (C.D. Cal. 2021) (holding that failing to disclose publicly available YouTube videos was harmless because the other party could have found them).

[169] *Chambers*, 501 U.S. at 36–39.

1  plaintiff's plainly privileged documents.[170]  Another Ninth Circuit panel reached the same

2  conclusion in *Lahiri v. Universal Music and Video Distribution Group* after the plaintiff brought

3  and maintained a frivolous copyright-infringement suit for five years although "even a cursory

4  investigation into the circumstances" of the claim would have revealed its baselessness, and the

5  plaintiff misrepresented caselaw to cover it up.[171]

6        The record in this case lacks the intentionality of the misconduct in *Chambers*, *Gomez*,

7  and *Lahiri*.  While Plaza and its counsel could have found and followed up on various references

8  to CF's work in discovery exchanged pre-trial, that failure amounts at most to negligence.

9  Travelers points out that the prevarication was not Breslin's alone, as Plaza's engineering

10 director Phil Reed joined with Breslin's witnesses to proliferate the bogus, white-tarp story.  To

11 be sure, Reed's recount of Breslin's tarping efforts was wrong.  But on this record I cannot

12 conclude that he intentionally lied about the precautions he remembered observing Breslin take

13 six years earlier.  It's equally possible that, over the many years that this case languished, the

14 memory of this Vietnam Veteran who left the employment of the Plaza in 2019[172] had degraded

15 and been supplanted with Breslin's repeated representations that it did its job, or got mixed up

16 with other accounts.

17       And although D'Antonio's insufferably pugnacious style did not garner my sympathy or

18 that of his opposing counsel for the predicament that he and his colleagues ultimately found

19 themselves in, I also must consider the way in which Plaza and its counsel responded when they

20 received the time-lapse images.  Plaza's counsel immediately researched its ethical obligations

21

22 ──────────────

[170] *Gomez v. Vernon*, 255 F.3d 1118, 1124–25 (9th Cir. 2001).

23 [171] *Lahiri v. Univ. Music and Video Dist. Grp*, 606 F.3d 1216, 1220–22 (9th Cir. 2010).

[172] ECF No. 221 at 179–82.

and concluded that it could not proceed.[173]  On the very next trial day, they abandoned the case. These end-of-trial actions do not suggest bad faith; they instead suggest that Plaza and counsel missed the time-lapse footage, but once they became aware of it, they took responsibility for the mistake.

When I permitted post-judgment discovery in this case, I did so because Travelers had shown that it was possible that Plaza was perpetrating an intentional fraud on the court by failing to disclose material evidence.[174]  But all that post-judgment discovery revealed was misplaced trust in the representations of Breslin employees, an apparently honest misunderstanding of the scope of CF's work, and discovery protocols that fell below best practices.  I cannot infer bad faith from these facts.

**D.   An award under 28 U.S.C. § 1927 is not supported by this record.**

28 U.S.C. § 1927 gives district courts discretion to award "the excess costs, expenses, and attorneys' fees reasonably incurred because" an attorney "so multiplies the proceedings in any case unreasonably and vexatiously."[175]  "An award of sanctions under § 1927 'does not distinguish between winners and losers, or between plaintiffs and defendants.'"[176]  Recklessness is all that is necessary to justify an award of fees and costs under § 1927,[177] and the award must be satisfied by the offending attorney personally—not the client.[178]

---

[173] *See* ECF No. 274-19; ECF No. 274-20; ECF No. 274-23; ECF No. 274-24.

[174] *See* ECF No. 257.

[175] 28 U.S.C. § 1927.

[176] *Braunstein v. Arizona Dep't of Transp.*, 683 F.3d 1177, 1189 (9th Cir. 2012) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 762 (1980)).

[177] *Id.*

[178] 28 U.S.C. § 1927.

The basis for Travelers' § 1927 sanctions request is the same as all of its others: Plaza's counsel failed to find the time-lapse footage, so everything counsel did throughout this litigation—deposing witnesses, amending Plaza's complaint, engaging in motion practice over discovery, moving for summary judgment, and going to trial—unreasonably and vexatiously multiplied the proceedings.[179]  But Travelers' inability to show that Plaza's trial counsel acted recklessly dooms this argument just like its NRS 7.085 one.[180]  I thus deny Travelers' request for attorneys' fees under 28 U.S.C. § 1927, too.[181]

## Conclusion

At the end of all this, I am well aware that Travelers is out millions of dollars for this bungled case.  But both sides are somewhat to blame for the slow crash-and-burn that was this lawsuit.  Had Plaza investigated more thoroughly and ensured proper ESI protocols, maybe this case would have ended far earlier and with far less time and resources wasted by Plaza, Travelers, and this court.  But Travelers' discovery work didn't net this footage, either.  And it also overlooked disclosed emails and a publicly available promotional video that may have led to this time-lapse footage long before the jury heard four days of the white-tarp story.  Because I cannot conclude that the fault was all Plaza's, and because Travelers has not shown that Plaza or its counsel acted in bad faith, recklessly, or without a reasonable basis to file and maintain this

---

[179] ECF No. 265 at 39.  Travelers includes Plaza's local counsel Shan Davis, Esq. as a target of its request for attorney sanctions.  But Travelers identifies no facts showing, and devotes no argument to, Davis's actions throughout this case.  My denial of this motion includes any request for sanctions against Davis as wholly unsupported.

[180] *See supra* at pp. 22–24.

[181] Plaza's counsel filed a notice of objections to various statements in Travelers' reply brief that counsel contends mischaracterized evidence.  ECF No. 282.  I reviewed the entirety of the exhibits that counsel contends Travelers misstated or presented in a misleading way and have come to my own conclusions about what those exhibits show.  Because attorney arguments are not evidence, I did not consider Travelers' arguments as such.  I thus overrule Plaza's objections.

lawsuit, Travelers' motion for attorneys' fees **[ECF No. 265] is DENIED**.  And because this case is closed and there is nothing left to resolve, Weg & Myers's stipulation to substitute itself as counsel for itself **[ECF No. 288] is DENIED as moot**.[182]

_____

U.S. District Judge Jennifer A. Dorsey
September 29, 2023

---

[182] Even if I were not rejecting this stipulation as moot, I would do so because Weg & Myers out-of-state attorneys appearing _pro hac vice_ cannot represent themselves in this courthouse without local counsel.